# IN THE SUPREME COURT OF TEXAS

════════════
No. 11-0554
════════════

CITY OF LORENA, TEXAS, PETITIONER,

v.

BMTP HOLDINGS, L.P., RESPONDENT

═══════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════════

**Argued November 6, 2012**

JUSTICE GUZMAN delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE LEHRMANN, JUSTICE BOYD, and JUSTICE DEVINE joined.

JUSTICE LEHRMANN filed a concurring opinion.

JUSTICE HECHT filed a dissenting opinion, in which CHIEF JUSTICE JEFFERSON joined.

Municipalities must ensure that essential public facilities are available to their residents. To assist in accomplishing this goal, the Legislature has allowed municipalities under Chapter 212 of the Local Government Code to enact temporary moratoria on "property development" if they can demonstrate the moratoria are needed to prevent a shortage of essential public facilities. That right, however, is subject to certain limitations. One limitation is that a municipality may not enact such a moratorium unless it contains a summary of evidence showing that it is limited to property that has

not been approved for development,[1] which the statute defines to include subdivision or construction.

Here, the municipality approved a subdivision plat and subsequently enforced a moratorium against the property, citing the municipality's additional sewage system capacity requirements. The landowner sued for a declaratory judgment that the moratorium did not apply against its approved development and for damages arising from a regulatory taking under an inverse condemnation claim. The trial court granted summary judgment in favor of the municipality on the declaratory judgment and inverse condemnation claims and awarded attorney's fees to the municipality. The court of appeals reversed, holding that the moratorium could not apply to the property in question because it had been approved for development before the moratorium took effect. The court remanded the inverse condemnation and attorney's fees claims. We hold that the moratorium cannot apply to the property because the municipality approved the property for subdivision before it enacted the moratorium, and the owner is therefore entitled to prevail on its declaratory judgment claim. We further conclude that, with respect to the inverse condemnation claim, the trial court must resolve factual disputes pertaining to the extent of the government's interference with the owner's use and enjoyment of its property before the merits of the takings claim are judicially addressed. Accordingly, we affirm the judgment of the court of appeals and remand this cause to the trial court for further proceedings.

---

[1] TEX. LOC. GOV'T CODE § 212.135(b)(2)(B).

2

## I. Background

This appeal concerns a series of moratoria on sewer connections the City of Lorena (City) applied to seven residential lots due to capacity issues with the municipal sewer system. Various statutes and regulations require municipalities to be proactive with regard to the capacity of their utilities. For example, Chapter 212 of the Local Government Code requires a municipality to confirm that when it approves a development plat, the plat conforms with the municipality's plans and ordinances concerning current and future utilities. TEX. LOC. GOV'T CODE § 212.047(1). Additionally, the Texas Commission on Environmental Quality (TCEQ) requires municipalities whose sewers reach 75% capacity to make plans to increase capacity and obtain TCEQ authorization to commence construction of that additional capacity when the system reaches 90% capacity. 30 TEX. ADMIN. CODE § 305.126.

The TCEQ initiated enforcement proceedings against the City regarding its sewer system in late 2004. At that point in time, the City had preliminary studies and plans for a replacement sewage treatment plant but had not begun construction.

BMTP Holdings, L.P. (BMTP) is a residential real estate developer operating in the City. As a developer, BMTP does not construct residences. Rather, it obtains municipal approval of plats to divide property into residential lots and build community infrastructure such as roads, storm drains, curbs, and taps into the municipality's sewer system. BMTP then sells the subdivided property to builders who obtain municipal permits and construct houses on the lots. Prior to 2003, BMTP began subdividing the property at issue for a residential subdivision named South Meadows

3

Estates. The project was divided into five phases, and this appeal concerns seven lots in the fourth and fifth phases.

In January 2006, the City Council approved the final plat for phase five of South Meadows Estates, having already granted final approval of phase four. The City Manager then executed the plat, indicating the City's acceptance of it and its eligibility for filing with the county clerk's office. In the spring of 2006, BMTP began building the infrastructure for the fifth phase of the development, which it completed in May 2006.

Also during the spring of 2006, engineers the City retained to evaluate its sewage system informed the City that the system was over capacity and could pose problems if the volume of sewage continued to increase. The engineers recommended a temporary moratorium on sewer tap permits to allow the City time to remedy the problem.

The City enacted a moratorium on June 5, 2006, which stated:

> [N]o city employee . . . shall accept for filing any applications for the issuance of one or more sewer taps. Applications, together with any documents or fees accompanying the applications, which are submitted during the duration of this ordinance, shall be returned to the applicant as unfiled.

The moratorium was to last 120 days and specifically exempted pending sewer tap applications and completed but inactive sewer tap construction. The moratorium also allowed aggrieved applicants to appeal to the City Manager or his designee, showing why the moratorium would deprive the applicant of vested property rights. Importantly, though the moratorium contained some of the written findings and a portion of the summary of the evidence required by Chapter 212 of the Local Government Code, it contained no findings or a summary showing that the moratorium was limited

4

to property that had not been approved for development. *See* TEX. LOC. GOV'T CODE § 212.135(b)(2)(B).

Shortly after the moratorium's adoption, the City Manager delivered the final approved plat to a manager of BMTP. The City Manager informed BMTP's manager that the City had adopted a moratorium on the issuance of sewer tap permits and intended to enforce that moratorium against South Meadows Estates.

The City Council voted to extend the moratorium seven times, each time for a 120-day period. The first extension contained substantially the same language as the original moratorium with two additions. First, at the request of BMTP, the extension exempted fifteen lots in South Meadows Estates that BMTP had contracted to sell prior to the moratorium. The City refused to exempt BMTP's remaining seven unsold lots. Second, the extension contained a new finding that the City was taking steps to become a member of the Waco Metropolitan Area Regional Sewerage System (WMARSS).

The second extension largely contained the terms of the first extension but changed the phrase "sewer taps" to "sewer connections."[2] The third and fourth extensions contained the same language and findings as the second extension.

After the City enacted the fourth extension, BMTP sent a letter to the City Attorney asking the City to reconsider its application of the moratorium and extensions to BMTP's seven remaining lots. Specifically, BMTP asserted that the City had already approved the plats for the seven lots, thus

---

[2] There is some dispute in the record regarding the nature of this change from "sewer taps" to "sewer connections." For the reasons explained in Part II.B, *infra*, we need not reach this issue.

5

exempting them by law from any moratorium. The City Attorney responded that the seven lots would not be exempted because the City had only approved the lots for subdivision—not construction. The City's fifth extension contained the same language as the previous extensions.

In its sixth extension, the City added a new finding that the exemptions set forth in the original moratorium and its extensions demonstrated that the moratorium was reasonably limited to property that had not been approved for the construction of residential or commercial buildings. The sixth extension also stated that the City had paid the equity cost to become a member of WMARSS and the cost of new treatment capacity to WMARSS but that such additional capacity would not be available until after the expiration of the extension.

Meanwhile, BMTP fielded inquiries about its seven non-exempt lots, but no potential buyer maintained interest in the lots once BMTP disclosed the moratorium. BMTP asserts that the value of these seven lots fell 83% while the moratorium and extensions were in effect. With the sixth extension still in effect, BMTP sought a declaratory judgment that the moratorium and its extensions could not be enforced against its remaining seven lots.

Subsequently, the City extended its 2006 moratorium for the seventh and final time, mirroring the language of the sixth extension. The City later re-initiated the moratorium process and adopted a new moratorium in November 2008, which was substantively similar to the sixth and seventh extensions.

In February 2009, BMTP amended its petition to include the new moratorium and added a claim for inverse condemnation, asserting that the wrongful application of the moratorium amounted to a regulatory taking. Both parties moved for summary judgment on the declaratory judgment

6

claim, and the City also moved for summary judgment on the inverse condemnation claim. The trial court granted summary judgment to the City, first on the declaratory judgment claim and subsequently on the inverse condemnation claim, and awarded attorney's fees and costs to the City.

The court of appeals reversed, holding that section 212.135 of the Local Government Code prohibits municipalities from enforcing moratoria against approved development. 359 S.W.3d 239, 245. The court of appeals also remanded the inverse condemnation claim, finding that the trial court's summary judgment could have been based on its ruling on the declaratory judgment claim. *Id.* at 246. Finally, the court of appeals remanded the issue of attorney's fees for a determination of whether the grant remained equitable and just. *Id.* at 247; *see* TEX. CIV. PRAC. & REM. CODE § 37.009.

## II. Discussion

The City argues that BMTP's claims are not ripe because BMTP failed to comply with the procedures set forth in the moratorium. Additionally, the City asserts the moratorium validly applies to BMTP's seven lots and, therefore, BMTP's inverse condemnation claim is meritless. We address each argument in turn.

### A. Ripeness

Initially, the City contends that BMTP's claims are not ripe because BMTP has not complied with the moratorium's application, appeal, or waiver procedures. The City's argument concerning the application process is unavailing because the process does not give rise to a mandatory requirement and, as structured, would nonetheless be futile. The moratorium provided that "no city employee . . . shall accept for filing any applications for the issuance of one or more sewer

7

connections," and that the "[a]pplications, together with any documents or fees accompanying the applications . . . shall be returned to the applicant as unfiled." We first note that this procedure does not impose a requirement that an aggrieved landowner file an application; rather, it is a process by which the City will return any applications to the owner as unfiled. Moreover, this process would effectively render futile any attempt by BMTP to file an application as it would have been summarily returned. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998) (holding that "futile variance requests or re-applications are not required" to make regulatory takings claims ripe). Thus, the moratorium's application process is not a bar to BMTP's claims.

Regarding the appeal procedure, the moratorium stated that an "applicant for a sewer connection application aggrieved by the City's decision not to accept for filing or to further process such application may appeal for relief to the City Manager, or his designee." We have recognized that "administrative bodies only have the powers conferred on them by clear and express statutory language or implied powers that are reasonably necessary to carry out the Legislature's intent." *Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006). If the Legislature grants an administrative body sole authority to make a determination in a dispute, the municipality has exclusive jurisdiction over the dispute and "a party must exhaust all administrative remedies before seeking judicial review of the decision." *Id*. Here, the parties have not cited to, nor are we aware of, any such Legislative grant of sole authority. Accordingly, we cannot say that failure to exhaust administrative remedies bars BMTP's claims.

Lastly, we cannot agree with the City's argument that BMTP's claims must fail because it did not obtain a waiver as provided by the moratorium. The moratorium sets forth a waiver

8

procedure for aggrieved applicants who "claim[] a right obtained under a development agreement" or "provid[e], at the applicant's expense, the additional capacity to the City's wastewater treatment plant . . . ." This waiver procedure tracks the statutory requirement for a waiver procedure for rights obtained under a development agreement or for a landowner that will fund public facilities at its own cost. TEX. LOC. GOV'T CODE § 212.137(a). But BMTP claims no right under a development agreement and has not volunteered to fund additional sewage system capacity; hence, the moratorium's waiver procedure does not apply to BMTP. In sum, we conclude the City's ripeness assertions regarding the application, appeal, and waiver procedures in the moratorium do not bar BMTP's claims.

## B. Declaratory Judgment

Having resolved the City's ripeness arguments, we now turn to whether the moratorium validly applies to BMTP's seven lots. The crux of this case involves statutory construction. Our goal in interpreting any statute is to "ascertain and give effect to the Legislature's intent as expressed by the language of the statute." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). To determine that intent, we look first to the "plain and common meaning of the statute's words." *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We examine statutes as a whole to contextually give meaning to every provision. *Id*. "Municipal ordinances must conform to the limitations imposed by the superior statutes, and only where the ordinance is consistent with them, and each of them, will it be enforced." *Bolton v. Sparks*, 362 S.W.2d 946, 950 (Tex. 1962); *see also Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998) ("[I]n reviewing an ordinance, the court is to consider all the

circumstances and determine as a matter of law whether the legislation is invalidated by a relevant statute or constitutional provision.").

As an initial matter, we determine that the moratorium relevant to BMTP's declaratory judgment claim is the November 2008 moratorium. BMTP filed its live pleading in March 2009, which sought "[a] declaration that under Chapter 212 of the Local Government Code, any and all *existing* moratoriums . . . do not apply to any of the lots contained in South Meadows Estates . . . ." (emphasis added). At the time of this amended pleading, only the November 2008 moratorium was in effect. Accordingly, any declaration must be in regard to the November 2008 moratorium.[3]

We now turn to whether the November 2008 moratorium complied with Chapter 212 of the Local Government Code. Section 212.133 states that "[a] municipality may not adopt a moratorium on property development unless the municipality: . . . makes written findings as provided by Section 212.135 . . . ." TEX. LOC. GOV'T CODE § 212.133(2). Section 212.135 provides that "[a] moratorium is justified by demonstrating a need to prevent the shortage of essential public facilities. The municipality must issue written findings based on reasonably reliable information." *Id*. § 212.135(a). One such required finding is "a summary of: . . . evidence demonstrating that the moratorium is reasonably limited to . . . property that has not been approved for development because of the insufficiency of existing essential public facilities." *Id*. § 212.135(b)(2)(B). Thus, in context, the plain language of these statutes provides that a moratorium regarding a shortage of

---

[3] As explained in Part II.C, *infra*, the prior ordinances, while irrelevant to the declaratory judgment claim, are relevant to the inverse condemnation claim because they involve the character of the government's action during the time it was applying the moratoria against BMTP.

10

essential public facilities must not affect approved development. *Id.* §§ 212.133(2), 212.135. It therefore follows that a moratorium enacted to prevent a shortage of essential public facilities that affects approved development conflicts with the controlling statute and is invalid. *Id.* § 212.135; *see Bolton*, 362 S.W.2d at 950.

At this juncture, the parties dispute what constitutes approved development under Chapter 212, which defines development as "the construction, reconstruction, or other alteration or improvement of residential or commercial buildings or the subdivision or replatting of a subdivision of residential or commercial property." TEX. LOC. GOV'T CODE § 212.131(3). The City contends that because development is subdivision "or" construction, it may place a moratorium on construction for property it has approved for subdivision. BMTP responds, and the court of appeals agreed, that because Chapter 212 defines development as subdivision or construction, the City may not enforce a moratorium on property it previously approved for subdivision or construction. We agree with BMTP and the court of appeals.

Chapter 212 defines development as "the construction, . . . of residential or commercial buildings or the subdivision . . . of residential or commercial property." *Id.* Under the plain language of the statute, subdivision constitutes development; thus, a moratorium may not affect property previously approved for subdivision (or construction). *Id.* The two types of development (subdivision and construction) have separate approval processes and often involve, as here, separate entities pursuing subdivision and construction for the same property. *See id.* § 212.001 *et seq.* (regulating municipal platting process for subdivisions); *id.* § 245.001 *et seq.* (regulating issuance of permits for construction). We have previously held that the Legislature's use of the disjunctive

11

word "or" is significant when interpreting statutes. *See Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 581 (Tex. 2000) ("This reading is supported by the use of the disjunctive conjunction 'or' between the two phrases, which signifies a separation between two distinct ideas."). By using the word "or" in defining "development," the Legislature indicated that these distinct aspects are brought within the singular scope of the term development. *Id.* (noting that the use of the word "or" signifies separation of distinct ideas).[4] Giving effect to the statute's plain language, a property need not be approved for both the subdivision and construction aspects of development to be insulated from moratoria regarding shortages of essential public facilities; it is insulated from such subsequent moratoria when the municipality approves either subdivision or construction. *See* TEX. LOC. GOV'T CODE §§ 212.131(3), 212.135(b)(2)(B).

Construing the definition of development to encompass both subdivision and construction also comports with the broader statute. *See Gonzalez*, 82 S.W.3d at 327. When a municipality approves a plat, Chapter 212 requires it to confirm that the plat conforms with its plans and ordinances concerning current and future utilities. TEX. LOC. GOV'T CODE § 212.047(1). This requires the municipality to assess at the start of the development process the impact on utilities the development will have when completed. The Legislature's requirement that the municipality engage in this assessment at the outset buttresses the conclusion that the Legislature intended Chapter 212

---

[4] *See also Cherokee Water Co. v. Freeman*, 33 S.W.3d 349, 354 (Tex. App.—Texarkana 2000, no pet.) (holding that the word "or" in the phrase "living or visiting with them" was intended to allow either "living" or "visiting" to modify the pronoun "them," thereby making either a viable way of fulfilling the requirements of the clause).

to prevent moratoria regarding shortages of essential public facilities from applying to either approved subdivision or approved construction.

The City responds that the difference between Chapters 212 and 245 of the Local Government Code compel the conclusion that Chapter 212 grants it the right to place a moratorium on construction that applies to approved subdivision.[5] Chapter 245 of the Local Government Code grants vested rights to entities in most circumstances to develop property under the ordinances in effect when they first filed their plat applications. *Id.* § 245.002. The City notes that Chapter 245 collectively defines the various approvals needed for a project as a single series of permits. *Id*. § 245.002(b). The City reasons that the Legislature could have collectively identified property development as a project in Chapter 212 as it did in Chapter 245 and prohibit moratoria from affecting development that was approved at any stage. But the City's argument ignores that the Legislature can accomplish the same goal with different language, as it did here. Just as Chapter 245 addresses a project in terms of a series of permits from the original plat application to completion, Chapter 212 addresses approved development as approved subdivision or approved construction. The chapters use different phraseology but both cover the spectrum from the beginning to the end of the development process. *See Hartsell v. Town of Talty*, 130 S.W.3d 325, 328 (Tex. App.—Dallas 2004, pet. denied) (holding Chapter 245 does not distinguish between subdivision and

---

[5] We note that municipalities are not encumbered by the strictures of Chapter 212 in every situation affecting essential public utilities. For example, municipalities may use police powers when necessary to safeguard the public safety and welfare. *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 635 (Tex. 1996). The City does not claim that its circumstances were exigent enough to justify use of the police power.

construction). The comparison of Chapters 212 and 245 only bolsters the weight we give to the Legislature's plain language.

Moreover, the City's reading would yield a labyrinthine statutory framework. The definition of development uses the word "or" six times. *See* TEX. LOC. GOV'T CODE § 212.131(3) ("'Property development' means the construction, reconstruction, *or* other alteration *or* improvement of residential *or* commercial buildings *or* the subdivision *or* replatting of a subdivision of residential *or* commercial property." (emphases added)). We construe statutes to provide consistent meaning to the same word used throughout a statute. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). Accepting the City's interpretation yields a series of twelve subcategories of development subject to a municipality's moratoria regarding a shortage of essential public facilities. *See id*.[6] Rather than establishing twelve subcategories of development, the Legislature broadly defined development to include all of its discrete aspects, which prevents a moratorium regarding a shortage of essential public facilities from applying to development approved at any point in that process.

*Amicus* Texas Municipal League claims our interpretation will allow developers to delay developing their approved plats until municipalities pass moratoria (thereby insulating themselves

---

[6] Treating "or" in the discrete manner the City suggests results in the following twelve subcategories of development: (1) construction of residential buildings; (2) construction of commercial buildings; (3) reconstruction of residential buildings; (4) reconstruction of commercial buildings; (5) other alteration of residential buildings; (6) other alteration of commercial buildings; (7) improvement of residential buildings; (8) improvement of commercial buildings; (9) subdivision of residential property; (10) subdivision of commercial property; (11) replatting of a subdivision of residential property; and (12) replatting of a subdivision of commercial property. *See* TEX. LOC. GOV'T CODE § 212.131(3).

from competition and potentially obtaining higher profits). But the Legislature has already contemplated such a scenario and enacted section 245.005 to allow local governments to establish ordinances related to dormant projects. TEX. LOC. GOV'T CODE § 245.005. Moreover, this problem may also be avoided if municipalities assess the impact of development on utilities when approving that development, as section 212.047 requires. The a*micus*'s concerns are therefore unwarranted, and we decline the invitation to rewrite the Legislature's definition of development based on a concern the Legislature addressed elsewhere in the Local Government Code.

Applying the plain language of Chapter 212 to the moratorium at issue, the City approved BMTP's final plat in January 2006—almost two years before it passed the moratorium at issue and four months before it passed any moratorium. Because the City approved the residential subdivision for the seven lots at issue, the property constitutes approved development under Chapter 212. *Id*. §§ 212.131(3), 212.135(b)(2)(B). Accordingly, the moratorium cannot validly apply against BMTP's seven lots, and we therefore affirm the judgment of the court of appeals with respect to BMTP's declaratory judgment claim. *Id*.; *see Bolton*, 362 S.W.2d at 950.[7]

### C. Inverse Condemnation

BMTP also seeks damages for the City's application of the moratorium against its seven lots under an inverse condemnation claim for a regulatory taking. We have held that a regulatory taking occurs when the government has unreasonably interfered with a claimant's use and enjoyment of its

---

[7] In light of our holding, we need not reach the issues of whether the moratorium met the technical requirements of Chapter 212 or whether the moratorium violated vested rights under Chapter 245.

property.  *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 489 (Tex. 2012).  To determine whether such an interference has occurred, we follow the *Penn Central* inquiry, which requires us to consider all of the circumstances surrounding the alleged taking. *Id.* (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)); *Sheffield Dev. Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 672–73 (Tex. 2004).  The United States Supreme Court has identified three key factors to guide our analysis: (1) the economic impact on the claimant; (2) the extent of interference with the claimant's investment-backed expectations; and (3) the character of the government's action. *Penn Cent.*, 438 U.S. at 124.

Here, the trial court granted the City's motion for summary judgment on BMTP's inverse condemnation claim, and we must determine whether that ruling was error in light of our holding that BMTP was entitled to prevail on its declaratory judgment claim.  In its summary judgment motion on the inverse condemnation claim the City asserted that none of the three grounds for a regulatory taking existed here because: (1) the moratorium existed for a valid purpose; (2) some economic value remained in the property; and (3) the moratorium was a reasonable interference with BMTP's use and enjoyment of its property. *See Sheffield*, 140 S.W.3d at 671–72.[8]  The trial court granted summary judgment in favor of the City on the inverse condemnation claim without specifying the grounds, which the court of appeals reversed and remanded.  359 S.W.3d at 246–47.  Because any one of the these three regulatory takings theories could potentially support BMTP's

---

[8] We have also held that in certain circumstances a municipality "commits no taking when it abates what is, in fact, a public nuisance." *City of Dallas v. Stewart*, 361 S.W.3d 562, 569 (Tex. 2012).  The City did not assert this theory in its motion, so that ground is not at issue here.

inverse condemnation claim, the City must have conclusively disproven all three theories for the trial court's grant of summary judgment to be proper.

We review the trial court's grant of summary judgment *de novo*. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 331 S.W.3d 419, 422 (Tex. 2010). The ultimate determination of whether an ordinance constitutes a compensable taking is a question of law, but "we depend on the district court to resolve disputed facts regarding the extent of the governmental intrusion on the property." *Sheffield*, 140 S.W.3d at 673 (quoting *Mayhew*, 964 S.W.2d at 933). Thus, we must determine whether any disputed issues of fact exist concerning the extent of the City's intrusion on BMTP's property—in which case we must remand to the trial court to resolve the dispute and determine the extent of the government's intrusion. *Id*.

In the summary judgment context, we review the record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). BMTP may defeat summary judgment by showing the existence of factual disputes regarding the extent of the moratorium's intrusion on BMTP's property, which the trial court must resolve. *Sheffield*, 140 S.W.3d at 673. In *Sheffield*, we found there was no taking under the *Penn Central* test when: (1) the record was devoid of evidence of the economic impact on the owner; (2) the record was devoid of evidence of frustration of the owner's investment-backed expectations; and (3) the moratorium was validly enacted. *Id.* at 680.

By contrast, here BMTP has presented evidence that raises factual disputes with regard to the extent of the moratorium's intrusion on BMTP's property. Regarding the economic impact on the owner, the City asserts the seven lots have lost no value because BMTP never lowered the sales

17

price of those lots when the moratorium was in effect and because BMTP's manager testified that he hoped to sell the lots for approximately $25,000 each when the moratorium is lifted (compared to sale prices of approximately $20,000 for lots sold before the moratorium took effect). BMTP argues the value of the lots has diminished by as much as 83% due to the moratorium based on a comparison of the value of lots sold before the moratorium took effect to the tax appraisal value while the moratorium was in place.[9] *See Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012) (noting that when a property owner testifies as to the value of his property, "[e]vidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors may be offered to support the claim").

Regarding the frustration of the owner's investment-backed expectations, the City argues that BMTP's manager testified he was expecting to sell the lots for approximately $25,000 each once the moratorium is lifted and that the lots will be some of the only developed lots available in the area. BMTP counters with testimony from its manager that his expectation was that BMTP would be able to sell the lots to builders once the subdivision was completed, as it had done for the previous lots in South Meadows Estates. Despite interest in the remaining seven lots from potential buyers, BMTP has been unable to sell the lots as a result of the moratorium.

And regarding the character of the government's action, we held in Part II.B, *supra*, that the November 2008 moratorium could not be enforced against BMTP because the City had previously

---

[9] When BMTP protested the tax assessed value of its land due to the moratorium, the appraisal review board adjusted the assessed value to $23,124 for all seven lots (and average value of $3,303 per lot).

18

approved the subdivision of the seven lots in question. *See* TEX. LOC. GOV'T CODE § 212.135(b)(2)(B). Likewise, the City enforced the June 2006 moratorium and its extensions against BMTP's approved development. *Id.* We must also view the character of the government's specific actions toward the landowner with the broader purpose of the government's action, which here was to assure an adequate supply of necessary public facilities. *See Sheffield*, 140 S.W.3d at 680 (assessing poor character of governmental action with respect to delaying rezoning during moratorium with broader character of zoning for planned development).[10]

These facts, viewed in the light most favorable to the nonmovant, indicate that the extent of the moratorium's intrusion on BMTP's property is still in dispute. *City of Keller*, 168 S.W.3d at 824. Thus, we cannot determine as a matter of law whether the moratorium's intrusion on BMTP's property went so far as to constitute a taking under *Penn Central*. *See Hearts Bluff*, 381 S.W.3d at 489. For this reason, the City has failed to meet its burden of establishing that no issues of material fact exist with respect to its interference with BMTP's use and enjoyment of its property and that it is entitled to judgment as a matter of law. *Sheffield*, 140 S.W.3d at 673. We therefore conclude the trial court's grant of summary judgment was error and remand for resolution of these factual disputes and to determine the extent of governmental intrusion before assessing whether a regulatory taking has occurred.[11]

---

[10] Though the City does not raise the argument, in certain circumstances a municipality commits no taking when it validly exercises its police power to protect the public safety and welfare. *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex. 1984).

[11] In light of our disposition, we need not address the City's arguments that its moratorium was based on a valid public purpose and that some economic value remained in the property.

## D. Attorney's Fees

Finally, we must consider the trial court's award of attorney's fees. The trial court awarded the City attorney's fees when it ruled in favor of the City on the declaratory judgment claim. Under the Declaratory Judgment Act, a "court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. The decision of whether to award attorney's fees is within the discretion of the trial court, but the question of whether attorney's fees are equitable and just is a question of law. *Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998). The trial court's grant of attorney's fees here was based on its determination that BMTP was not entitled to a declaratory judgment that the moratorium could not apply to its seven lots. Because we have held the moratorium cannot apply against BMTP's seven lots, we remand the issue of attorney's fees to the trial court to determine whether its grant remains equitable and just in light of our holding.

## E. Response to the Dissent

The dissent laments that: (1) there will be "sewage in the streets;" (2) municipalities will be "out of luck" and have no mechanism to solve their problems; and (3) section 212.135(b)(2)(A) validates the moratorium here. All three assertions are misguided.

Simply put, the Legislature in Chapter 212 requires municipalities to be proactive and assess the impact of development on utilities when they approve the development. TEX. LOC. GOV'T CODE § 212.047(1). If utility issues nonetheless persist, municipalities may place moratoria on new development in affected areas in accordance with the procedural requirements of Chapter 212. *Id*. §§ 212.133, .135. If issues still persist and threaten the public safety and welfare, municipalities

20

have police powers and powers to abate nuisances at their disposal. *See supra* notes 5, 8. Thus, the Legislature has weighed the competing interests of developers and municipalities and resolved the conflict by allowing developers to continue building approved development and equipping municipalities with mechanisms at the various stages of utility issues to adequately address such problems. By using the mechanisms at their disposal, municipalities may avoid "sewage in the streets" and are never "out of luck" when addressing a shortage of public facilities.[12]

The dissent also relies heavily on section 212.135(b)(2)(A) as a basis for validating the moratorium. Section 212.135 requires the moratorium to contain a summary of evidence demonstrating the moratorium is reasonably limited to:

> (A)     areas of the municipality where a shortage of essential public facilities would otherwise occur; and

> (B)     property that has not been approved for development because of the insufficiency of existing essential public facilities.

TEX. LOC. GOV'T CODE § 212.135(b)(2). The dissent reasons that "(B) is a complete subset of (A): the areas of town where shortages will occur include every area where development has not been approved because of existing shortages." __ S.W.3d at __ (Hecht, J., dissenting). The dissent concludes that under our interpretation, "only (B) must be met," and subsection (A) is rendered meaningless. *Id*. at __.

---

[12] Relatedly, the dissent decries that municipalities will be forced to spend resources defending suits rather than building public facilities. On the contrary, complying with Chapter 212 would avoid litigation altogether because the municipality would plan for the needed sewage capacity when approving a development plat and not impose a moratorium on approved development.

Aside from the fact that no party or judge has claimed that subsection (A) is in any way relevant to this moratorium, the premise that subsection (B) is wholly subsumed by subsection (A) is flawed. There will undoubtedly be occurrences when a shortage of essential public facilities only affects part of a municipality. In such a circumstance, the municipality may impose a moratorium only on the affected area under subsection (A) and only on new development in that area under subsection (B). Subsection (A) is not rendered meaningless. It prevents municipalities from imposing moratoria on new development in unaffected areas. Because one sewer served the entire City here, no party has argued that subsection (A) has any bearing on the validity of the moratorium at issue.

### III. Conclusion

Chapter 212 of the Local Government Code prevents moratoria regarding a shortage of essential public facilities from affecting previously approved development. It also defines development to include subdivision or construction. Because the City approved BMTP's subdivision for the seven lots at issue before it passed the moratorium, the seven lots constitute approved development that the moratorium cannot affect. Thus, BMTP is entitled to prevail on its declaratory judgment claim. Regarding the inverse condemnation claim, factual disputes persist that the trial court must resolve with respect to the extent of the moratorium's interference with BMTP's use and enjoyment of its property before a court may determine if a taking has occurred. Finally, the grant of attorney's fees was based on the trial court's finding that the moratorium was valid. Because we have affirmed the court of appeals' reversal of this ruling, the trial court must assess whether its award of attorney's fees remains equitable and just. Accordingly, we affirm the judgment of the

22

court of appeals, which rendered judgment for BMTP on its declaratory judgment claim and remanded the inverse condemnation and attorney's fee claims to the trial court for further proceedings.

_____
Eva M. Guzman
Justice

OPINION DELIVERED: August 30, 2013