

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00224-CV

———————————————————

IN THE INTEREST OF A.W. AND A.W., Children

---

On Appeal from the 325th District Court
Tarrant County, Texas
Trial Court No. 325-674489-19

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellants J.J. (Mother) and A.W. (Father) appeal the termination of their parental rights to their two children, A.W. (Amy) and A.W. (Andy).[1]  Mother argues that (1) because she completed her court-ordered service plan, due process required that the children be returned to her care; and (2) there is insufficient evidence that termination was in the children's best interest.[2]  Father's counsel, meanwhile, has filed an *Anders* brief stating that there are no arguable, meritorious grounds for challenging the termination of his parental rights.  Because we agree with Father's counsel and conclude that Mother's appeal likewise lacks merit, we will affirm.

## I.  Background

Domestic violence marked the relationship between Mother and Father.  The Department of Family and Protective Services repeatedly intervened, starting several years before the termination case at issue here.

### A.  Prior Removal and Violence

In early 2020, the Department removed then-three-month-old Amy from Mother's and Father's care due to reports of domestic violence between the parents.

---

[1]We use aliases to refer to the children and their parents.  *See* Tex. R. App. P. 9.8(b)(2).

[2]At the time of the 2025 trial, Amy was five years old and Andy was four.

Less than a year later, in 2021, Andy was born, and he too was removed.[3] Mother worked with the Department to secure her children's return, and in mid-2022—after she moved into a new residence for which Father did not have the address—the children were provisionally returned to her care. The trial court prohibited Mother from allowing Father to interact with the children outside of his approved, Department-supervised visitations, though.

Yet, within days, not only was Father at Mother's new residence, but also the police were dispatched to the home due to a verbal altercation between Mother and Father. The trial court signed a temporary order enjoining the parents from coming within 300 feet of one another or one another's residences. Despite the injunction, a month later, the police were called back to Mother's residence for yet another incident involving Father. A Department investigator later explained that Mother had "called [Father] over" to her residence; that "there had been an incident"; and that Mother had become so agitated, "erratic[,] and aggressive" that the police "did not feel that it was safe for her to keep [Amy]," so they had left Amy with Father. The trial court revoked the provisional return.[4]

---

[3]By late 2021, the Department had been appointed permanent managing conservator of Amy, with Mother and Father having possessory rights.

[4]In Mother's attempts to get the children back after the provisional return was revoked, she filed an affidavit stating that the Department had "submitted false information" to remove the children and that Father "ha[d] not shown any aggression ever around the children." [Capitalization altered.]

Nonetheless, in October 2022, Mother was appointed sole managing conservator of the children, Father was given visitation rights, and the Department's case was closed. In light of the history of domestic violence, the custody order provided for the parents to exchange the children at a neutral location unless they agreed otherwise.

In the year that followed, the police responded to incidents at Mother's residence on more than twenty occasions. Initially, the officers warned Father to stay away from Mother's residence and cited him for criminal trespass, but they stopped doing so when, after a few months, Mother admitted that she had periodically invited or had allowed Father to come over. The numerous police reports from this time period documented incidents ranging in severity from verbal altercations between Mother and Father, to Father's stealing Mother's phone, to Father's kicking in the door, to Father's choking Mother, to Father's threatening Mother with a weapon.

Then, in November 2023, Mother again allowed Father to come to her residence to exchange custody of the children, and when Father blocked Mother's driveway with his vehicle, Mother backed her vehicle into his while the children were in the backseat. Father responded by pulling into the driveaway and intentionally hitting Mother's vehicle "so hard that [Mother's] bumper . . . fell off" and "[h]er trunk was completely smashed in."

After the vehicle incident, Mother sought modification of the custody order. The resulting modification prohibited Father from coming within 20 miles of

4

Mother's residence and ordered Father to have a third party exchange the children on his behalf. But Mother continued to allow Father to visit the children outside of the modified order's parameters.

Finally, in early January 2024, Mother and Father got into a physical fight during a custody exchange. Mother described the fight for a Department investigator by stating that Father had "thr[own] the child at her and spit in her face." The Department intervened.

## B. Present Case and Violence

The Department sought termination of Mother's and Father's parental rights, and the trial court ordered that the children be removed from their care.

### 1. 2024 Removal

When a Department investigator arrived at Mother's home to pick up the children for removal, Mother shut the door, grabbed a kitchen knife, and threatened violence. The investigator later recalled Mother's saying "something along the lines of, [']Somebody is going to die today.[']" Ultimately, removing the children required the assistance of several police officers and an order permitting entry into Mother's residence. One of those officers later recalled Mother's making suicidal threats such as, "You're going to have to kill me in order to take my children."

### 2. Post-Removal Events

Meanwhile, the trial court ordered Mother and Father to comply with Department-created service plans as conditions for their reunification with their

children.[5]  *See* Tex. Fam. Code Ann. §§ 263.102, .106.  Mother's plan required her to, among other things, complete domestic-violence-intervention programs and individual therapy.  Mother substantially complied with her service plan.[6]

But the violent encounters between Mother and Father continued.  In April 2024, Father threatened several individuals at Mother's home with a firearm.  He was arrested and pleaded guilty to unlawful possession of a firearm by a felon, for which he remained incarcerated through the time of the 2025 termination trial.[7]

Mother took the opportunity to secure a new apartment and job, telling her caseworker that she no longer had contact with Father and had moved on.  But Father's jail records showed otherwise.

Mother visited Father twelve times during his first six months in jail, and she talked to him on the phone more than seventy times.  When confronted with these records, Mother gave differing explanations, telling her caseworker that she was

---

[5]Father did not complete his service plan.

[6]Although Mother testified that she had completed all of her required services, her caseworker testified that she had tested positive for marijuana at one point and had not been discharged from her individual counseling at the time of trial. Nonetheless, the Department conceded that Mother had complied with her court-ordered services, and when the trial court announced and explained its findings at the trial's end, it "recognize[d] that [M]other ha[d] completed her services."

[7]Father had prior convictions for, among other things, violation of a protective order (on multiple occasions), assault family violence by choking (on multiple occasions), and burglary of a habitation.

informing Father of the children's status but later testifying that she was also sorting out their intertwined finances and helping with Father's business affairs.

Mother's interactions with the Department were concerning in other aspects as well. According to a Department investigator, at one of the initial hearings in the case, Mother threatened to "kick [the investigator's] a**" and "jumped at [her] . . . in an aggressive manner as if she w[ere] going to swing on [her]." Mother exhibited similar aggression towards her caseworker, who later testified that Mother had "charg[ed] at [her]" and had "told [her] to tread lightly[] because she knew [the caseworker's] address to [her] home." On another occasion, Mother became "aggressive" during a visitation with the children, and when she was asked to leave, she "refused" and "show[ed the caseworker] that she had a TASER in her bag."

### 3. The Children

As for the children, their time in the Department's care unearthed some of the things they had experienced.

The children told their therapist about the violent dynamic between Mother and Father and "the use of knives and a lot of physical aggression that they saw." Amy stated that "Mommy always had a cha-cha," pointing to a kitchen knife and explaining that "she saw Mommy mad with it." The children also reported that both Mother and Father had hit them on the legs, arms, and face. And, in addition to the physical abuse, Amy made an outcry of sexual abuse, confiding in her therapist "[t]hat a friend of Mommy's touched her in her private part."

The children also exhibited significant behavioral issues. The caseworker later described how Andy had "open-handedly slap[ped] his foster mom," and both the caseworker and the children's therapist reported that the children had thrown toys, had kicked, had screamed, had used profanity, and had "struggl[ed] to interact with peers."

### 4. Trial and Judgment

The termination case proceeded to a bench trial in early 2025. Mother testified that she had no plans to reunite with Father, described what she had learned in her domestic-violence-intervention programs, and stated that Father's incarceration had given her the time and physical separation she needed to "detach[] away from him."[8] She offered evidence of her stable employment, appropriate housing, and plans for the children.

The Department, in turn, offered evidence of Mother's pattern of returning to Father, her decision to stay in contact with him while he was in jail, her violent tendencies, and the children's behavioral issues. The Department conceded, though, that the children had been shifted through a series of foster placements, with Amy moving between six homes and Andy moving been five homes. At the time of trial, the children were not placed together, and although the Department reported that it

---

[8]When asked if she planned "to be back with [Father]," Mother responded, "Absolutely not."

had two paternal placements that would potentially allow the children to be reunited, it was still reviewing the suitability of those options.

The trial court commented that it was "disappointed and disgusted when it c[ame] to some of the [Department's] placement issues."[9]  However, it highlighted Mother's and Father's history of domestic violence, it noted Mother's pattern of returning to Father and her decision to continue contacting him in jail, and it expressed skepticism regarding Mother's credibility overall.  Ultimately, the trial court found that both Mother and Father had endangered the children by their conduct and environment[10] and that termination of both parents' rights was in the children's best interest.[11]  *See id.* § 161.001(b)(1)(D), (E), (b)(2).

## II.  Mother's Appeal

Mother raises two issues:  (1) whether due process required the children to be returned to her care based on her completion of her service plan; and (2) whether the

---

[9]In its termination order, the trial court directed the Department to arrange for joint sibling therapy and to present the court with proposed placements that would allow the children to live together.

[10]The trial court also found that Father had constructively abandoned the children.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N).

[11]The trial court signed a termination order, then two weeks later, it signed another.  The two orders were substantially similar, but the second order removed a handwritten note that had set a deadline for the Department to arrange for joint sibling therapy.

9

evidence was legally and factually sufficient to support the trial court's best interest finding.[12]

## A.    Due Process

Mother first argues that her right to due process—as implemented and codified in the Family Code—required the return of the children to her care because she substantially complied with her service plan. *See generally id.* §§ 161.001(b), 263.102.

The Texas Legislature has "balance[d] the convergent and divergent interests of parent and child" by enacting Section 161.001 of the Family Code, which establishes "a two-part standard that permits termination of the parent–child relationship only if (1) the parent's acts or omissions satisfy at least one statutory [predicate] ground for termination and (2) termination is in the child's best interest." *In re A.C.*, 560 S.W.3d 624, 629–30 (Tex. 2018); *see* Tex. Fam. Code Ann. § 161.001(b); *In re B.C.*, No. 02-24-00541-CV, 2025 WL 1478178, at *3 (Tex. App.—Fort Worth May 22, 2025, no pet.) (mem. op.). Mother's argument centers on the first component—the statutory predicate grounds listed in Section 161.001.

As Mother points out, one of Section 161.001's statutory predicate grounds is the parent's failure to comply with her court-ordered service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). According to Mother, because service-plan noncompliance is a predicate ground for termination, *id.*, and because another Family

---

[12]Mother's issues are reordered for organizational purposes.

Code provision—Section 263.102—requires the service plan to specify the "steps that are necessary to . . . return the child to the child's home," *id.* § 263.102(a)(6)(A), the Family Code as a whole "implicitly acknowledges" that "adherence to the service plan prohibits the termination of . . . parental rights, regardless of any supplementary [predicate] grounds [for termination]."[13]

Notably, Mother does not cite any case law to support her proposed interpretation of the Family Code. And this is likely due to the volume of precedent holding to the contrary: "[A] parent's successful completion of a family service plan does not guarantee reunification with [her] child." *In re A.F.*, No. 04-16-00008-CV, 2016 WL 3626235, at *7 (Tex. App.—San Antonio July 6, 2016, no pet.) (mem. op.); *In re A.C.B.*, 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.) ("[A] parent's compliance with a service plan does not preclude a finding that termination is in the child's best interest."); *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[W]e disagree that compliance with an agency's family service plan also renders termination impossible."); *see In re Z.N.*, 602 S.W.3d 541, 544 & n.2 (Tex. 2020) (noting lower court's unchallenged holding that there was insufficient evidence of father's noncompliance with service plan but nonetheless recognizing that trial court could terminate rights under non-service-plan predicate ground); *In re B.J.*, No. 02-24-00428-CV, 2025 WL 646633, at *8 (Tex. App.—Fort

---

[13]In fact, Mother "contends that her adherence to the plan precluded the Department from even initiating termination proceedings."

Worth Feb. 27, 2025, no pet.) (mem. op.) (declining to review predicate finding regarding father's noncompliance with service plan because "only one ground is necessary for termination" and because the court had already held that a non-service-plan predicate ground independently supported termination); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *4, 8–13 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.) (affirming termination based on non-service-plan predicate ground despite mother's having "completed all of the requirements in her service plan"); *see also In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (recognizing that termination may be based on "one or more of the twenty-one [statutorily] enumerated grounds" so "[t]o affirm a termination judgment on appeal, a court need uphold only one termination ground . . . [plus the] best interest finding").

This well-established interpretation is rooted in Section 161.001's plain language. *See Z.N.*, 602 S.W.3d at 547 (interpreting another Section 161.001 statutory predicate ground based on statute's plain language). Section 161.001 lists the predicate grounds with the disjunctive "or," meaning that they are alternatives to one another. Tex. Fam. Code Ann. § 161.001(b)(1); *see White v. Tex. Dep't of Fam. & Protective Servs.*, No. 01-04-00221-CV, 2005 WL 174546, at *3 (Tex. App.—Houston [1st Dist.] Jan. 27, 2005, no pet.) (mem. op.) (recognizing that "[t]he separate grounds for termination are listed in the Texas Family Code[] joined with the disjunctive term 'or'[, so] a court may base a termination . . . upon a finding that a parent engaged in conduct described in any one of the alleged grounds"); *In re J.M.C.A.*, 31 S.W.3d 692,

696 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (similar); *see also Broadway Nat'l Bank, Tr. of Mary Frances Evers Tr. v. Yates Energy Corp.*, 631 S.W.3d 16, 24 (Tex. 2021) (interpreting Property Code, citing dictionary definition of "or," and noting that "this Court has recognized that 'or' is typically understood as a disjunctive term, meaning that either of the separated words or phrases may be employed without the other"). Mother makes no mention of Section 161.001's disjunctive phrasing. *Cf. City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 642 (Tex. 2013) (interpreting Local Government Code and noting that "[w]e have previously held that the Legislature's use of the disjunctive word 'or' is significant when interpreting statutes").

Nor does Mother explain how her proposed interpretation of the Family Code would avoid rendering the non-service-plan predicate grounds meaningless. According to Mother, none of Section 161.001's non-service-plan predicate grounds could support termination unless the trial court also found that the parent failed to comply with her service plan—which is itself an independent predicate ground. *See generally* Tex. Fam. Code Ann. § 161.001(b)(1). But this would effectively nullify the purpose of any non-service-plan predicate findings. Even if those predicate findings could be used for tangential purposes in other contexts,[14] they would be ineffective as

---

[14]If a trial court finds that a parent's actions meet certain endangerment-related predicate grounds, then the finding can be used to support the termination of the parent's rights to other children in the future. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (listing as predicate ground that the parent has had her parental rights terminated "with respect to another child based on a finding . . . . [under] Paragraph (D) or (E)"). Consequently, an endangerment predicate finding would

13

a basis for termination. We cannot gut Section 161.001 in this manner. Rather, we must "presume [that] the Legislature selected language in [the] statute with care and that every word or phrase was used with a purpose in mind." *Z.N.*, 602 S.W.3d at 547 (interpreting another statutory predicate ground and reiterating canon of construction); *cf. Broadway Nat'l Bank*, 631 S.W.3d at 24 (reiterating "presum[ption that] the Legislature included each word in the statute for a purpose").

The other Family Code provision that Mother points to—Section 263.102— does not support her proposed interpretation either. Mother emphasizes Section 263.102's requirement that "[t]he service plan must . . . state steps that are necessary to . . . return the child," Tex. Fam. Code Ann. § 263.102(a)(6)(A), and she reasons that such mandatory language means that the child "must" be returned to the parent upon the completion of the "necessary" steps, *see id.* But Mother's argument ignores the distinction between a necessary condition and a sufficient condition. "Conditions that are sufficient *guarantee* a result, while conditions that are merely necessary do not." *Am. Nat'l Ins. Co. v. Arce*, 672 S.W.3d 347, 356 (Tex. 2023) (interpreting necessary-but-not-sufficient condition in Insurance Code). Section 263.102 contemplates the

---

have future ramifications even if the trial court also found that the parent had failed to complete her service plan. *See generally N.G.*, 577 S.W.3d at 235–37 (discussing ramifications of endangerment findings). But even then, the endangerment finding would not be dispositive for purposes of the case then before the court. *Cf. In re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024) (noting that "termination under [one predicate ground wa]s sufficient to reverse the judgment" but nonetheless reviewing endangerment predicate findings "because a finding . . . under those grounds may justify termination of parental rights to other children").

14

latter—the steps "that are necessary to . . . return the child"—rather than the former. Tex. Fam. Code Ann. § 263.102(a)(6).

Thus, based on both well-established precedent and the plain language of the Family Code, we overrule Mother's first issue.

## B.    Best Interest

In her second and final issue, Mother argues that there was legally and factually insufficient evidence to support the trial court's finding that termination was in the children's best interest.

### 1.    Standard of Review

When reviewing the sufficiency of a best interest finding, we ask whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Z.N.*, 602 S.W.3d at 545; *A.C.*, 560 S.W.3d at 630–31. Both legal and factual sufficiency turn on this question; the distinction between the two "lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630–31. For legal sufficiency, we view the evidence in a light most favorable to the finding, *R.R.A.*, 687 S.W.3d at 276; *Z.N.*, 602 S.W.3d at 545; *A.C.*, 560 S.W.3d at 630–31, but for factual sufficiency, we consider the disputed evidence that a reasonable factfinder could not have credited in favor of the finding and weigh its significance in light of the entire record. *A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Either way, neither sufficiency analysis allows us to

15

supplant the factfinder's credibility determinations with our own. *R.R.A.*, 687 S.W.3d at 276; *A.C.*, 560 S.W.3d at 630–31.

## 2. Governing Law

As for the best interest inquiry itself, it "is child-centered, focusing on the child's well-being, safety, and development." *B.C.*, 2025 WL 1478178, at *5; *A.O.*, 2022 WL 1257384, at *13. Although we presume that the best interest of a child is served by keeping the child and parent together, *see B.C.*, 2025 WL 1478178, at *5, we consider several other factors as well, including (1) the custody-seeking party's plans for the child; (2) the party's parental abilities; (3) the programs available to assist the party; (4) the emotional and physical danger to the child; (5) the emotional and physical needs of the child; (6) the stability of the proposed placement; (7) the acts or omissions of the parent indicating that the parent–child relationship is not a proper one; and (8) any excuse for those acts or omissions.[15] *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *A.O.*, 2022 WL 1257384, at *14.

## 3. Children's Best Interest

As the trial court acknowledged, there is evidence on both sides of the best interest issue.

On one hand, Mother

---

[15]These factors are neither exhaustive nor exclusive. *A.O.*, 2022 WL 1257384, at *14.

- completed her court-ordered services—including the domestic-violence-intervention programs—and continued to attend therapy at the time of trial, *see B.C.*, 2025 WL 1478178, at *5 (noting in best interest analysis that father had completed most services); *A.O.*, 2022 WL 1257384, at *14 (similar, noting that mother had completed services); *see also Holley*, 544 S.W.2d at 371–72 (listing programs available to assist the parent as best interest consideration);

- regularly attended visitation with the children, *see B.C.*, 2025 WL 1478178, at *5 (noting in best interest analysis that father had regularly attended visitation); *A.O.*, 2022 WL 1257384, at *14 (similar, noting that mother had attended visitation); *see also Holley*, 544 S.W.2d at 371–72 (listing parental abilities and acts demonstrating a proper parent–child relationship as best interest considerations);

- secured stable employment at a local municipal entity and held the job for approximately six months before trial, *see B.C.*, 2025 WL 1478178, at *5 (noting in best interest analysis that father had maintained employment throughout the case); *A.O.*, 2022 WL 1257384, at *14 (noting that mother had secured two jobs to provide for the children); *see also Holley*, 544 S.W.2d at 371–72 (listing children's physical needs as best interest consideration);

- leased an apartment that the caseworker agreed was suitable for the children, *see B.C.*, 2025 WL 1478178, at *5 (noting in best interest analysis that father had secured "appropriate housing"); *A.O.*, 2022 WL 1257384, at *14 (similar, noting that mother had secured stable housing); *see also Holley*, 544 S.W.2d at 371–72 (listing children's physical needs as best interest consideration); and

- arranged for the children to use her health insurance and to attend a local after-school program until she could pick them up each day, *see Holley*, 544 S.W.2d at 371–72 (listing parent's plans for the children as best interest consideration).

Meanwhile, the Department's plans for the children were, in the trial court's words, "disappoint[ing]." *Cf. id.* (listing party's plans as best interest consideration). It was undisputed that

- Amy had been in six different placements; Andy had been in five; and at the time of trial, the children were not placed together,[16] *cf. id.* (listing the stability of the home or placement as best interest consideration); *A.O.*, 2022 WL 1257384, at *14–15 (recognizing that, "[g]enerally, it is in a child's best interest to keep siblings together whenever possible");

- although a psychological evaluation had recommended sibling therapy, the therapy was not occurring at the time of trial due to the distance between the children's placements, *see Holley*, 544 S.W.2d at 371–72 (listing programs available to assist the party seeking custody as best interest consideration); and

- the Department was still reviewing long-term placement options for the children and did not have a confirmed placement that would allow the children to live together, *see id.* (listing the stability of the proposed placement as best interest consideration).

All of this evidence weighed against a finding that termination of Mother's parental rights was in the children's best interest, and a reasonable factfinder could not have ignored it. *See A.C.*, 560 S.W.3d at 630–31 (clarifying scope of evidence considered in sufficiency review); *A.O.*, 2022 WL 1257384, at *14–15 (noting that, when mother planned to keep siblings together and Department planned to split them up in placements that were still under review, such evidence weighed against a finding that termination was in the children's best interest).

Nonetheless, other evidence raised significant concerns regarding the stability of Mother's home and the children's emotional and physical safety in her care. *See Holley*, 544 S.W.2d at 371–72 (listing the stability of the home and the emotional and physical danger to the children as best interest considerations). And the "placement

---

[16]The caseworker testified that part of the reason the children were not placed together at the time of trial was due to Amy's continued "aggressive" behavior.

18

of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a); *A.O.*, 2022 WL 1257384, at *15 (quoting statute).

Mother had repeatedly failed to protect the children from Father's violence:

- The children witnessed "a lot of physical aggression" between Mother and Father, including violence involving knives, *cf. B.C.*, 2025 WL 1478178, at *6 (noting in best interest analysis that father had not only committed domestic violence against Mother but also had done so in front of the child);

- Even when court orders or police warnings protected Mother and the children from Father—as the temporary injunction, modified custody order, and criminal-trespass warnings had done—Mother continued contacting Father and inviting him to her residence; and

- In 2023—while the children were in Mother's care—there were more than twenty domestic violence incidents between Mother and Father, including the vehicle incident that directly jeopardized the children's safety.

In addition, the record demonstrated that Mother had violent and erratic tendencies of her own:

- The children told their therapist that both Mother and Father had hit them.

- Mother acknowledged that she had two convictions for assault family violence for hitting Father and for cutting him, *cf. id.* (noting father's criminal history and pending charge for assaulting mother in best interest analysis).

- Mother had a pattern of aggression against other adults: she "jump[ed] at" the Department investigator, "charg[ed] at" her caseworker; warned the caseworker to "tread lightly[] because she knew [the caseworker's home] address"; and issued violent and suicidal threats during the children's 2024 removal.

The record also showed that Mother's violent home environment had observable effects on the children. *See Holley*, 544 S.W.2d at 371–72 (listing the emotional danger to the children as best interest consideration). The children's

therapist described the children's "physical aggression" as consistent with kids who had been exposed to domestic violence, and both the therapist and the caseworker reported that the children's behavior frequently regressed after visitations. Mother's testimony, meanwhile, indicated that she had failed to appreciate the effects on her children's behavior. In fact, she insisted that the children's behavior was "on the normal-kid level," attributing their tantrums to their being kids.

Similarly, the record demonstrated that—despite Mother's acceptance of responsibility for some of her "bad choices"—she minimized the violence and continued to maintain a relationship with Father:[17]

- The Department investigator testified that when she had spoken with Mother regarding the 2023 vehicle incident, Mother had stated that Father was a bad boyfriend but a good father and that she did not believe that he would hurt the children.

- Throughout 2024—while Mother was engaging in domestic-violence-intervention programs and telling her caseworker that she had no contact with Father—she was regularly visiting Father in jail and talking with him on the phone for extended periods of time.

---

[17]Although Mother claimed that she had permanently "detach[ed]" from Father, there was evidence to the contrary, and the trial court was not required to believe her. *Cf. J.O.A.*, 283 S.W.3d at 346 (reviewing endangerment finding and noting that, "evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"); *B.C.*, 2025 WL 1478178, at *7 (reviewing evidence that termination was in child's best interest and noting that, although father had completed substance-abuse program and testified that he did not intend to drink or use drugs again, he had relapsed after prior participation in a substance-abuse program).

Based on the record, the factfinder could have formed a firm belief or conviction that Mother could not or would not provide a safe, stable, nonviolent environment for the children. So although the record contains evidence on both sides of the best interest issue, a reasonable factfinder could have weighed all the evidence and formed a firm belief that termination of Mother's parental rights was in the children's best interest. The evidence was factually sufficient. *See A.O.*, 2022 WL 1257384, at *16 (noting that "[t]here [we]re factors on both sides of the best interest issue" and that, although mother had "completed all of [her] services," had secured stable housing and employment, and had made plans for the children, other evidence supported a firm conviction that termination was in children's best interest). And because the evidence is factually sufficient, it is necessarily legally sufficient as well. *Id.* at *8.

We overrule Mother's final appellate issue.

### III.  Father's Appeal

As for Father's appeal, his appointed appellate counsel has conducted a conscientious review of the record and concluded that there are no meritorious grounds for review.[18]  *See Anders v. California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 1400

---

[18]Father's counsel argues that there is legally and factually insufficient evidence to support the trial court's predicate finding that Father constructively abandoned the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N); *supra* note 10.  But as counsel acknowledges, there is sufficient evidence to support the trial court's other predicate findings, so the constructive abandonment finding is not dispositive and "this court [need] not reach the merits of th[e] point." *See* Tex. R. App. P. 47.1.

21

(1967); *In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth, order) (holding *Anders* procedures apply to parental termination appeals), *disp. on merits*, 2003 WL 2006583, at *1–3 (Tex. App.—Fort Worth May 1, 2003, no pet.) (per curiam) (mem. op.).  Father's counsel has filed an *Anders* brief, mailed a copy of his brief to Father, informed Father of his right to request the record and to file a pro se response, and provided Father with a motion template to facilitate his accessing the record.  *See Anders*, 386 U.S. at 744, 87 S. Ct. at 1400; *Kelly v. State*, 436 S.W.3d 313, 319–20 (Tex. Crim. App. 2014); *B.C.*, 2025 WL 1478178, at *4.  Father has neither sought access to the record nor responded to his counsel's *Anders* brief.[19]

After conducting our own independent review of the record, we agree with Father's counsel that there are no meritorious grounds for review.  *See B.C.*, 2025 WL 1478178, at *4 (noting in mother's *Anders* appeal that "we independently examine[] the appellate record to determine if any arguable grounds for appeal exist").  Father has a documented history of domestic violence, much of which occurred in the children's presence, and some of which involved them directly.  Thus, evidentiary sufficiency challenges to the trial court's predicate and best interest findings would not be meritorious.  *See* Tex. Fam. Code Ann. § 161.001(b)(1), (b)(2); *B.C.*, 2025 WL 1478178, at *6–7 (noting that father's criminal history and domestic violence

---

[19]The Department opted not to file a response to Father's counsel's *Anders* brief but expressed its "agree[ment] . . . that Father has no meritorious grounds upon which to advance an appeal."

22

supported findings of conduct-based endangerment of child and that termination was in child's best interest).

And nothing else in the record shows any other arguable ground for review. The record does not reveal any jurisdictional flaws, *see, e.g.*, Tex. Fam. Code Ann. §§ 152.201, 263.401; it reflects the trial court's compliance with the relevant statutory procedures and deadlines, *see, e.g., id.* § 263.4011; and it demonstrates that Father had effective legal representation in the trial court. In short, our independent review of the record confirms that, as Father's counsel concluded, Father's appeal is frivolous. *See B.C.*, 2025 WL 1478178, at *4 (conducting brief *Anders* analysis and reaching similar conclusion).

## IV. Conclusion

Because Mother's two appellate challenges fail and because Father's appeal is frivolous, we affirm the trial court's termination order. *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: August 28, 2025

23