# IN THE SUPREME COURT OF TEXAS

═══════════

No. 19-0689

═══════════

KATHLEEN POWELL & PAUL LUCCIA, PETITIONERS,

V.

CITY OF HOUSTON, TEXAS, RESPONDENT

═══════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════════════════

**Argued January 5, 2021**

JUSTICE BUSBY delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE BOYD joined, and in which JUSTICE DEVINE, JUSTICE BLACKLOCK, JUSTICE BLAND, and JUSTICE HUDDLE joined as to Part II.

JUSTICE BLAND filed a concurring opinion, in which JUSTICE DEVINE, JUSTICE BLACKLOCK, and JUSTICE HUDDLE joined.

This suit for declaratory judgment concerns whether the City of Houston's Historic Preservation Ordinance is a zoning ordinance enacted in violation of Houston's City Charter or Chapter 211 of the Texas Local Government Code. We conclude that the ordinance does not implement zoning as that concept is ordinarily understood, and therefore the City Charter's limits on zoning do not apply. But Chapter 211 of the Local Government Code does apply to the ordinance, and it provides that city regulation of structures in historically significant areas must meet several requirements. At trial, the plaintiffs failed to prove that the ordinance violates certain of Chapter 211's requirements. Because the record in this case does not show that the City ran

afoul of either its Charter or the provisions of Chapter 211 at issue here, we affirm the judgment in favor of the City.

## BACKGROUND

The City of Houston is a home-rule city, and its Charter prohibits zoning unless adopted through a binding referendum. HOUSTON, TEX., CHARTER, art. VII-b, § 13. The Houston City Council adopted the Historic Preservation Ordinance in 1995 without a referendum. The original Ordinance allowed the City to establish historic districts and required owners of properties in those districts to seek approval from the Houston Archaeological and Historical Commission before modifying or developing their property. Property owners sought this approval by applying for a certificate of appropriateness from the Commission. If the Commission denied the application, property owners could wait 90 days and obtain a waiver certificate that allowed them to make the proposed changes to the property.

In 2010, the City placed a moratorium on the waiver certificates and ultimately ended the practice altogether by amending the Ordinance. That same year, the City implemented a procedure for reconsidering a neighborhood's designation as a historic district. This process was triggered for the Heights East District, originally designated as a historic district in 2008, when the required number of residents and homeowners moved for reconsideration. The reconsideration effort was unsuccessful, and the City continued to apply the Ordinance to Heights East.

Kathleen Powell and Paul Luccia ("the Homeowners") each own property in Heights East. They brought this suit seeking a declaratory judgment that the Ordinance is void and unenforceable because it violates the City Charter's limits on zoning and it does not comply with certain provisions of Chapter 211 of the Local Government Code. The trial court denied the Homeowners'

2

requests for declaratory relief after a bench trial on stipulated facts, and it rendered judgment for the City.[1]

The Homeowners appealed, urging that the Ordinance is a zoning regulation. 580 S.W.3d 391, 401 (Tex. App.—Houston [1st Dist.] 2019). As the parties framed the issues, the Ordinance's validity turned on whether it implements zoning: if not, the City Charter's zoning limitations do not apply, and the City is not required to comply with the Local Government Code's procedural and substantive requirements for regulating buildings in historical areas. *Id.* The court of appeals held that the Ordinance is not a zoning regulation because the purposes for which it was created, its function, and its way of regulating property use and development all differ from those of zoning laws. *Id.*

The court pointed out that the Ordinance was intended to recognize, protect, and improve landmarks and areas of historical and architectural significance. *Id.* at 401–02. In contrast, Chapter 211 of the Local Government Code and this Court indicate that zoning regulations are used for community planning. *Id.* at 401 (citing TEX. LOC. GOV'T CODE § 211.004; *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 792 (Tex. 1982)). The court of appeals also noted that the Ordinance does not divide the City into geographically based zoning districts, classify buildings within zones, or provide uniform regulations as contemplated by Local Government Code section 211.005. *Id.* at 403. Instead, it individually regulates the outer appearance of homes on a case-by-case basis. *Id.*

---

[1] The Homeowners also sought a declaration that the reconsideration effort was successful and that Heights East was no longer a historic district. Because the Homeowners did not appeal the judgment against them on this declaration, we do not address the issue.

3

After surveying cases interpreting the concept of zoning, the court of appeals concluded that it is "a tool of community planning exercised in a more comprehensive plan than that provided by the [Ordinance's] protections for the historic character of a few small sections of the City."[2] The Ordinance lacked some of the key features of zoning regulation, the court reasoned, and therefore it did not violate the limits on zoning in the City Charter or Chapter 211. *Id.* at 407. The Homeowners sought review in this Court, which we granted.

### STANDARD OF REVIEW

We construe municipal ordinances the same way we construe statutes. *Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002). Their construction is thus a question of law that we review de novo. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). City ordinances are "presumed to be valid," and courts "have no authority to interfere unless the ordinance is unreasonable and arbitrary—a clear abuse of discretion." *Comeau*, 633 S.W.2d at 792 (quoting *Hunt v. City of San Antonio*, 462 S.W.2d 536, 539 (Tex. 1971)). It is the burden of the challenging party to demonstrate clearly that the ordinance is unreasonable and arbitrary. *City of San Antonio v. Pigeonhole Parking of Tex. Inc.*, 311 S.W.2d 218, 223 (Tex. 1958); *see also City of Pharr v. Tippit*, 616 S.W.2d 173, 176 (Tex. 1981) (noting that this burden is a heavy one).

---

[2] 580 S.W.3d at 406 (citing *N.W. Enters. v. City of Houston*, 27 F. Supp. 2d 754, 795–96 (S.D. Tex. 1998), *aff'd in part, rev'd in part, dism'd in part*, 352 F.3d 162 (5th Cir. 2003); *Comeau*, 633 S.W.2d at 793 n.4; *City of Houston v. Johnny Frank's Auto Parts Co.* 480 S.W.2d 774, 778 (Tex. Civ. App.—Houston [14th Dist.] 1972, writ ref'd n r.e.)).

ANALYSIS

As a home-rule city, Houston derives its authority from the Texas Constitution and the City Charter adopted by its voters. *See* TEX. CONST. art. XI, § 5. Houston's Charter generally confers on the City all powers granted to municipalities by the Constitution. HOUSTON, TEX., CHARTER, art. II, § 2.

Home-rule cities may exercise all powers not denied to them by the Constitution or state law. *See* TEX. CONST. art. XI, § 5; *City of Laredo v. Laredo Merchs. Ass'n*, 550 S.W.3d 586, 592 (Tex. 2018). These inherent powers include, for example, the authority to adopt and enforce building codes, *Town of Lakewood Vill. v. Bizios*, 493 S.W.3d 527, 531 (Tex. 2016), and in the case of both general-law and home-rule cities, the authority to regulate land use. *Comeau*, 633 S.W.2d at 793 n.4.

At every stage of this case, including in this Court, the Homeowners have taken the position that regulation of land use for historic preservation purposes is a valid exercise of the police power, and their requests for declaratory relief concern whether the City Charter or Chapter 211 of the Local Government Code limit the City's power. Several amici disagree with the former position, contending that historic preservation is not within the police powers conferred on municipalities by Article XI section 5 of the Constitution—commonly known as the home-rule amendment.[3]

Because no party has presented the issue raised by amici, it does not provide grounds for reversal. Our adversary system of justice "depends on the parties to frame the issues for decision

---

[3] These amici include the State of Texas, Texas Public Policy Foundation, and Texas Freedom Caucus. The Court also received amicus briefs from the Institute of Justice, groups of land development and scenic organizations, and groups of legal scholars and historical preservation organizations. The Court appreciates the assistance of all amici.

and assign[s] to courts the role of neutral arbiter of matters the parties present." *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782 (Tex. 2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). We do not seek out issues but "wait for the cases to come to us, and when they do we normally decide only questions presented by the parties." *In re Abbott*, 601 S.W.3d 802, 809–10 (Tex. 2020) (quoting *Greenlaw*, 554 U.S. at 244).

In any event, addressing the issue identified by amici is not necessary to resolve this case. As explained below, we conclude that Chapter 211 of the Local Government Code applies, and it provides that "[t]he governing body of a municipality may regulate" changes to "buildings and other structures" in "areas of historical . . . significance." TEX. LOC. GOV'T CODE § 211.003(b). Amici do not challenge this legislative authorization.[4]

We therefore proceed to address the issues raised by the parties: whether the Ordinance complies with the City Charter and Chapter 211. We consider each in turn.

## I. The Ordinance does not zone property in violation of the City Charter.

The Houston City Charter does not prohibit the City from zoning altogether, but it limits the City's power to adopt a zoning ordinance by requiring six months' notice of any proposed ordinance and voter approval in a binding referendum. HOUSTON, TEX., CHARTER, art. VII-b, § 13. Because the City held no referendum, the Ordinance is invalid if it constitutes zoning under the Charter.

---

[4] Accordingly, we need not consider whether this statute confers power on municipalities or confirms and limits the pre-existing police powers they enjoy under the home-rule amendment.

## A. The ordinary meaning of zoning

The Charter does not define "zoning," and the parties offer conflicting definitions. The Homeowners argue that zoning is the regulation of land (including both site and use regulation) by geographic district, and that the City has engaged in zoning by designating Heights East as a historic district. The City counters that "zoning" is a technical term referring to a city dividing all or most of its territory into zones according to a comprehensive plan. Under this definition, the City's designation of a mere 1% of its area as historic falls far short of the comprehensiveness common to zoning regulations.

Both of these arguments emphasize a single feature of zoning—either geographic districting or comprehensiveness—as dispositive. But zoning regulations have other characteristics, and given the prevalence of zoning ordinances, not all of these characteristics are always present. Before deciding whether this Ordinance constitutes zoning in violation of the Charter's limitations, we must first have a clear idea of what zoning is.

City charters are construed according to general rules of statutory interpretation. *Hunt v. City of Diboll*, 574 S.W.3d 406, 422 (Tex. App.—Tyler 2017, pet. denied); *Rossano v. Townsend*, 9 S.W.3d 357, 363 (Tex. App.—Houston [14th Dist.] 1999, no pet.). When a statute does not define a term, we look to its common, ordinary meaning unless a contrary meaning is apparent from the statute's language. *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34 (Tex. 2017). To determine this meaning, "we typically look first to dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Id*. at 35. We also consult treatises and commentaries. *See, e.g.*, *Rachal v. Reitz*, 403 S.W.3d 840, 845 (Tex. 2013). As we discuss in Part II below, Chapter 211 groups

together various types of city regulations under the heading "zoning regulations" and subjects all of them to certain statutory requirements. But not all of the regulations in that group are traditional forms of zoning, so we conclude that Chapter 211 does not alter the ordinary meaning of zoning for purposes of the City Charter. *See Jaster v. Comet II Constr., Inc*., 438 S.W.3d 556, 563 (Tex. 2014) (plurality op.) ("The fact that [a] word may sometimes be used to convey a different meaning is the very reason why we look for its common, ordinary meaning.").

Black's Law Dictionary defines "zoning" as the "legislative division of a region, esp[ecially] a municipality, into separate districts with different regulations within the districts for land use, building size, and the like." (11th ed. 2019). Accordingly, a zoning ordinance is defined as a city ordinance that regulates the use to which land within various parts of the city may be put. *Id*. *Zoning ordinance*. It also allocates uses to the various districts of a municipality, as by allocating residences to certain parts and businesses to other parts. *Id*. Defined separately, "historic preservation" is "[t]he effort to conserve, preserve, and protect artifacts and developed places, including structures and landscapes, of historical significance." *Id*. *Historic preservation*. Of all the subcategories of zoning listed in Black's—including for example spot zoning, density zoning, and partial zoning—there is no historic subcategory.

Looking beyond legal dictionaries, we see zoning defined as "the act or process of partitioning a city, town, or borough into zones reserved for different purposes (such as residence or business)." *Zoning*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster. com/dictionary/zoning (last visited June 2, 2021). The reference to "zones" makes this definition less complete, but we can still glean from it that zoning typically restricts the purposes for which land may be used and covers the entirety of a city. In the legal context, "zoning" can refer to a

8

"municipal or county regulation of land use effected through the creation and enforcement of zones under local law." *Id.*

These two definitions emphasize regulation of the uses to which land can be put—that is, the types of purposes or activities for which the land can be used or the functions it can serve. But Black's also mentions regulation of "building size and the like," which would capture so-called "site" regulations of the physical height and bulk of structures as well as setback requirements. Both definitions seem to contemplate that a city is generally zoned all at once. When Black's describes zoning as "the division of a region, esp[ecially] a municipality, into separate districts," it is the city—not some part of it—that is being divided. Similarly, the Merriam-Webster definition considers zoning the "act or process of partitioning a city." These definitions lend support to the City's argument that a city cannot be "a little bit zoned."

Court decisions shed further light on the essential characteristics of zoning. Many courts define the term by emphasizing regulation of land use, while others identify both use and site regulations as key features of zoning.[5] Though a question of first impression for this Court, a

---

[5] *See, e.g.*, *Bd. of Cnty. Comm'rs of Teton Cnty. v. Mackay Invs., LLC*, 413 P.3d 1120, 1123 (Wyo. 2018) ("Zoning is the process that a community employs to legally control the use which may be made of property and the physical configuration of development upon the tracts of land located within its jurisdiction."); *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 120 A.3d 677, 685 (Md. 2015) ("[Z]oning is used to describe the process of setting aside disconnected tracts of land varying in shape and dimensions, and dedicating them to particular uses designed in some degree to serve the interests of the whole territory affected by the plan.") (cleaned up); *City of Baton Rouge/Par. of E. Baton Rouge v. Myers*, 145 So. 3d 320, 327 (La. 2014) ("Zoning is a general plan designed to foster improvement by confining certain classes of buildings and uses of property to certain localities. The purpose of zoning is to reduce or eliminate the adverse effects that one type of land use might have on another."); *Lanvale Props., LLC v. County of Cabarrus*, 731 S.E.2d 800, 811 (N.C. 2012) ("Zoning, as a definitional matter, is the regulation by a local governmental entity of the use of land within a given community, and of the buildings and structures which may be located thereon, in accordance with a general plan.") (cleaned up); *Furlong Cos., Inc. v. City of Kansas City*, 189 S.W.3d 157, 163 (Mo. 2006) ("Zoning is the exercise of legislative authority as to what land uses are in the interest of the public for particular areas within the political subdivision."); *Perkins v. Bd. of Supervisors of Madison Cnty.*, 636 N.W.2d 58, 67 (Iowa 2001) ("Zoning is the division of land into distinct districts and the regulation of certain uses and developments within those districts."); *Square Lake Hills Condo. Ass'n v. Bloomfield Township.*, 471 N.W.2d

9

federal court defined "zoning" in the Houston City Charter to determine the validity of an ordinance alleged to have zoned parts of the city. *N.W. Enters.*, 27 F. Supp. 2d at 793. Among other changes, the local ordinance in *Northwest Enterprises* strengthened location restrictions on sexually oriented businesses by increasing the minimum permissible distance between those businesses and protected land uses from 750 to 1,500 feet. *Id*. at 792. The ordinance also broadened the class of protected land uses by adding public parks. *Id*. One argument against the ordinance was that these location restrictions were zoning regulations prohibited by the Charter because the City held no referendum and did not provide six months' notice before enacting them. *Id*. at 795.

That court heard the same arguments raised here: that the ordinance did not zone because it was not comprehensive, and that it did zone because it carved out small geographic districts around each protected use. *Id*. at 795–97. The court ultimately concluded that the ordinance did not zone in the "ordinary, contemporary, common meaning" of the term because "zoning" in the Charter "refers to the context of a more comprehensive plan than is provided by the locational

---

321, 326 (Mich. 1991) ("A zoning ordinance is defined as an ordinance which regulates the use of land and buildings according to districts, areas, or locations."); *City of New Orleans v. Elms*, 566 So. 2d 626, 628 (La. 1990) ("The essence of zoning is territorial division in keeping with the character of the lands and structures and their peculiar suitability for particular uses, and the uniformity of use within the division."); *State Nat'l Bank of Conn. v. Planning & Zoning Comm'n of Town of Trumbull*, 239 A.2d 528, 530 (Conn. 1968) ("Zoning is defined as a general plan to control and direct the use and development of property in a municipality or a large part of it by dividing it into districts according to the present and potential use of the properties.") (cleaned up); *Eves v. Zoning Bd. of Adjustment of Lower Gwynedd Twp*., 164 A.2d 7, 9 (Pa. 1960) ("Zoning is the legislative division of a community into areas in each of which only certain designated uses of land are permitted so that the community may develop in an orderly manner in accordance with a comprehensive plan."); *Bogert v. Washington Township*, 135 A.2d 1, 3 (N.J. 1957) ("The essence of zoning is a territorial division in consonance with the character of the lands and structures and their peculiar suitability for particular uses, and uniformity of use within the division.").

restrictions on sexually oriented businesses." *Id.* at 795–96.[6]

Our precedent offered the court some guidance on whether zoning tends to be comprehensive. *See id.* at 796 (citing *Comeau*, 633 S.W.2d at 793). In *Comeau*, both parties conceded that ordinances limiting the locations of mobile homes were essentially zoning ordinances, so we did not decide when an ordinance constitutes zoning. 633 S.W.2d at 793. Nor did we define zoning, though we did describe it as "a recognized tool of community planning, allowing a municipality, in the exercise of its legislative discretion, to restrict the use of private property." *Id*. at 792.

As relevant here, the issue in *Comeau* was whether the validity of the ordinances would be tested under the Texas Zoning Enabling Act or Brookside Village's police powers as a general-law municipality. *Id*. at 793 n.4. The Zoning Enabling Act—now part of Chapter 211 of the Local Government Code—requires zoning power to be exercised as part of a comprehensive plan, and Brookside Village had no plan. *Id*. The ordinances were therefore not authorized by the Zoning Enabling Act, and we analyzed them instead as regulations of land use under the general police power. *Id*. Our approach in *Comeau* indicates that some regulations of land use—like locational bans on specific uses—are not zoning regulations because they are not comprehensive either geographically or in establishing what uses are permissible. *See N.W. Enters.*, 27 F. Supp. 2d at 797.

---

[6] As the court of appeals in this case pointed out, 580 S.W.3d at 401 n.2, the district court's judgment in *Northwest Enterprises* was reversed in part on other grounds, but the Fifth Circuit approved the district court's analysis on this point. *See N.W. Enters.*, 352 F.3d at 178 ("This ordinance is no zoning regulation. The district court thoroughly and completely rejected this argument.").

A court of appeals identified similar features of zoning in reviewing a Houston ordinance requiring wrecking yards to be surrounded by a solid fence or wall, which had to be at least a specified height. *Johnny Frank's*, 480 S.W.2d at 775, 778. The court concluded:

> The ordinance with which this case is concerned is not a zoning ordinance. It does not establish a comprehensive plan by which the city is divided into districts wherein property is limited to specified uses and it was not passed in accordance with the procedures specified for the passage of zoning ordinances. This ordinance does not prohibit any particular use of any property, but merely regulates the use of property in the operation of an automobile wrecking or salvage yard.

*Id*. at 778.

Taken together, these cases identify several features common to zoning ordinances: implementation of a comprehensive plan of city-wide development, division of the city into geographic districts, and specification of the uses to which land can be put within each district. Although geographic comprehensiveness is informative, we do not suggest that it is essential, which would allow the City to skirt its Charter's notice and referendum requirements by zoning less than all of its territory. Like the court in *Northwest Enterprises*, we need not decide at what point the gradual geographic expansion of land-use regulation becomes zoning. *See* 27 F. Supp. 2d at 798. The Ordinance does not implicate this concern because, as explained below, it regulates less than one percent of lots in Houston.

These cases say little about what role the subject matter of the Ordinance—historic preservation—might play in informing whether it is considered a zoning ordinance. Here we can turn to federal courts, which considered separately the constitutionality of zoning and historic-preservation ordinances. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 107 (1978) (historic-preservation ordinance); *Village of Euclid v. Ambler Realty*, 272 U.S. 365, 386 (1926) (zoning ordinance). As the court of appeals recognized, these cases and other authorities illustrate

that not all regulation of the historical exterior features of buildings is zoning. *See* 580 S.W.3d at 407.

In 1965, New York City adopted its Landmark Preservation Law. *Penn Cent.*, 438 U.S. at 109. Like Houston's Historic Preservation Ordinance, New York's law allowed for the designation of landmarks and historic districts and placed restrictions on designated property. *Id.* at 110–11. Property owners challenged the application of the New York law to their property on the ground that its designation as a landmark constituted a taking without just compensation under the U.S. Constitution. *Id.* at 107. *Penn Central* presented a different question than this case, but the Court's separation of the zoning and historic dimensions of the law is informative for our purposes.[7] This distinction also explains why the Court heard *Penn Central* at all given that it had recognized the constitutional validity of zoning regulations fifty years earlier in *Euclid*.

The Court emphasized that historic preservation was something new: "[o]ver the past 50 years, all 50 States and over 500 municipalities have enacted laws to encourage or require the preservation of buildings and areas with historic or aesthetic importance." *Id*. This movement was motivated by the destruction of large numbers of historic structures as well as recognition that structures with special historic, cultural, or architectural significance enhance the urban environment. *Id.* at 108.

---

[7] Thus, our discussion of the New York law at issue in *Penn Central* should not be understood to indicate that the protections Texas law provides for private property rights—"one of the most important purposes of government," *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977)—are equivalent to those provided under the Takings Clause of the U.S. Constitution. To the contrary, the Texas Legislature has enacted several statutes that are more protective of landowners, including the Zoning Enabling Act discussed in Part II below. *See also* TEX. GOV'T CODE §§ 2007.001 *et seq*. (Private Real Property Rights Preservation Act); *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 197–98, 204 (Tex. 2012).

Fifty years earlier, the Court also saw zoning ordinances as an emerging solution to a then-novel problem:

> Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities.

*Euclid*, 272 U.S. at 386–87.

These cases show two movements in two periods. During the first quarter of the twentieth century, densification forced incompatible uses of land next to one another, leading to the creation of residential districts in places like the Village of Euclid. *See id*. at 390. In the decades following, states and cities took on the new task of preserving buildings with history and aesthetics that impacted the local environment in a different way. *Penn Cent.*, 438 U.S. at 107; *see also* Tad Heuer, Note, *Living History: How Homeowners in a New Local Historic District Negotiate Their Legal Obligations*, 116 YALE L.J. 768, 773 (2007) (tracking the rise of historic-preservation ordinances from 11 in 1957, to 421 in 1975, and 2,300 in 2002).

Treatises also shed light on the historical development of these two means of land regulation: "By and large, zoning and historic preservation are complementary legal regimes" with different focuses. 2 RATHKOPF'S THE LAW OF ZONING & PLANNING § 19:14 (4th ed.) (updated Apr. 2021). Both can regulate site, but zoning ordinances do so through height and bulk restrictions, while historic-preservation ordinances "focus on the architectural details" that communicate a building's significance and its connection to a neighborhood. *Id*.

These authorities indicate that historic-preservation ordinances do not necessarily constitute zoning, though we recognize that such ordinances can amount to zoning if they share

14

the common features of zoning we identify.[8]  In addition, it has become more common for cities to include provisions addressing historic preservation within their comprehensive zoning ordinances.  *See id.* § 19:15.

Early "Euclidean" zoning ordinances—like the one upheld in *Euclid*—separated incompatible land uses and restricted the height and bulk of buildings.  *Id.* § 1:4.  The same year *Euclid* was decided, the Standard State Zoning Enabling Act was republished.  It described the zoning power as the authority to:

> regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes.

U.S. Dep't of Commerce, A STANDARD STATE ZONING ENABLING ACT UNDER WHICH MUNICIPALITIES MAY ADOPT ZONING REGULATIONS 4–5 (1926).  This description shows that early zoning ordinances restricted use, height, and bulk but did not expand to aesthetic interests, let alone historical value.  The Texas Zoning Enabling Act authorizes each of these types of regulations, though the Legislature has incorporated additional regulations over time—including regulation of buildings in historical areas—as we discuss in Part II below.  *See* TEX. LOC. GOV'T CODE § 211.003.

The Standard State Zoning Enabling Act also required that zoning ordinances conform to a "comprehensive plan" and impose regulations that are "uniform for each class of buildings throughout each district."  U.S. Dep't of Commerce, *supra*, at 6; *see* TEX. LOC. GOV'T CODE

---

[8] We do not suggest that historic-preservation regulation "must not [be] view[ed] as zoning," or that such regulation is "subject to less vigorous review" because of the goals it promotes.  *Post* at __.  Rather, we clarify that a regulation is not zoning simply because it limits alteration of the historical exterior features of buildings, and that courts should decide whether any regulation constitutes zoning by using a consistent standard: whether it shares the common features of zoning.

§§ 211.004(a), .005(b). The uniformity requirement lives on in state enabling acts, almost all of which contain similar language. 1 AM. LAW OF ZONING § 9:23.10 (5th ed.) (updated May 2021).[9] On comprehensiveness, there should be "a relationship between the various existing and proposed physical features of the municipality, such as streets, highways, parks, public buildings, schools, institutions, bridges, and the zoning districts therein." RATHKOPF'S, *supra*, § 1:41. Zoning is therefore a tool used to implement a city's broader vision of itself, and anchoring a zoning scheme within a broader plan prevents it from being used to advance narrower interests ad hoc. *Id*.

Based on these dictionaries, cases, and treatises, we conclude that the ordinary meaning of zoning is the district-based regulation of the uses to which land can be put and of the height, bulk, and placement of buildings on land, with the regulations being uniform within each district and implementing a comprehensive plan. Zoning regulations also tend to be comprehensive geographically by dividing an entire city into districts, though this need not always be the case.

### B. The Ordinance is not zoning under this definition.

Applying this definition to the Ordinance shows that several key features of zoning are missing. Significantly, the Ordinance does not regulate the purposes for which land can be used. Regulation of use is central to all definitions of the term "zoning," including those in dictionaries, treatises, other jurisdictions, early zoning ordinances, and statutes modeled after the State Standard Zoning Enabling Act. Some jurisdictions restrict the definition entirely to regulation of use and do not contemplate site regulation. *See* n.5, *supra*. The Ordinance imposes no direct limits on

---

[9] Variances, conditional uses, and similar changes are permissible so long as they are applied according to standards that are themselves uniform. *Id.* Variances are generally limited to "exceptional circumstances" and decided according to standards established by a zoning ordinance. 8 McQUILLIN MUN. CORP. § 25:217 (3d ed.) (updated Aug. 2020). For example, the Texas Zoning Enabling Act requires uniform regulations within districts, TEX. LOC. GOV'T CODE § 211.005(b), but allows for variances in specific cases if they meet certain standards. *Id.* § 211.009(a)(3).

16

land use; it expressly disclaims such limits by providing that the Ordinance shall not be construed to authorize the City to regulate the use of any structure or property.[10] HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-202 (2021). The Ordinance therefore lacks a defining feature—and in some jurisdictions *the* defining feature—of zoning regulation.

Our concurring colleagues would also treat site regulations of the size, development, and placement of buildings as restrictions on the purposes for which land can be used. *Post* at __. But the authorities we have reviewed consider use and site regulations to be two separate features that are common to zoning ordinances. Although site regulations certainly can impact how owners choose to use their property, they do not directly regulate use of land as that concept is understood in the zoning context—that is, they do not prescribe the permissible and impermissible purposes for which land can be used or the activities that can occur there. For example, Dallas has an exhaustive list of regulated uses: agricultural, commercial and business service, industrial, institutional and community service, lodging, office, recreational, residential, retail and personal service, transportation, and utility and public service, among others. DALLAS, TEX., DALLAS CITY CODE, ch. 51A, §§ 51A-4.200 to -4.221 (2021).[11] And San Antonio goes so far as to define the term "land use," calling it "the purpose for which land or structures thereon is designed, arranged, or intended to be occupied or used, or for which it is occupied maintained, rented, or leased." SAN

---

[10] We do not take this statement in the ordinance "at face value." *Post* at __. Instead, having scrutinized the entire ordinance, we find no provisions that address the purposes for which land can be used. There are provisions that impact building placement and appearance, however, which we address below.

[11] Austin also "describes and classifies uses in the zoning jurisdiction," and its use categories are "residential, commercial, industrial, civic, and agricultural." AUSTIN, TEX., CODE OF ORDINANCES, ch. 25, § 25-2-1 (2021).

ANTONIO, TEX., UNIFIED DEVELOPMENT CODE, ch. 35, app. A, § 35-A101 (2006).[12]   This

understanding of land use is also consistent with the earliest zoning ordinances, which identified

three general classes of use—residential, commercial, and industrial—to protect single-family

residential use from commercial and industrial uses.  RATHKOPF'S, *supra*, § 10:1.

The concurrence cites the following passage to support its view that the Ordinance's site

regulations should be considered land-use regulations:

> Public regulation of the use and development of land comes in a variety of forms which generally focus on four aspects of land use: (1) the type of use, such as whether it will be used for agricultural, commercial, industrial, or residential purposes; (2) the density of use, manifested in concerns over the height, width, bulk, or environmental impact of the physical structures on the land; (3) the aesthetic impact of the use, which may include the design and placement of structures on the land; and (4) the effect of the particular use of the land on the cultural and social values of the community, illustrated by community conflicts over adult entertainment, housing for service-dependent groups such as low-income families and developmentally disabled persons, and whether the term family should be defined in land use regulations to include persons who are not related by blood or marriage.

*Land-use regulation*, BLACK'S LAW DICTIONARY (11th ed. 2019) (quoting Peter W. Salsich Jr.,

LAND USE REGULATION 1 (1991)).  This passage recognizes that regulation of the type of land use,

as well as site and development regulations, impact aspects of how land is used and its effect on

surrounding land.  *Id.*  But regulations of site and development are not themselves use regulations;

put another way, to say that buildings can only reach a certain height does not necessarily mean

they cannot serve a commercial purpose.  Instead, site and development regulations typically

---

[12] A treatise contains a similar definition: "The purpose or activity for which land or buildings are designed, arranged or intended or for which land or buildings are occupied or maintained."  AM. LAW OF ZONING, *supra*, § 9:56. A nearly identical definition appears in a practice guide for land-use litigation.  2 HANDLING THE LAND USE CASE: LAND USE LAW, PRACTICE & FORMS, app. A1 (3d ed.) (updated Nov. 2020) ("The principal purpose for which a lot or the main building or structure thereon is designed, arranged or intended and for which it is or may be used, occupied or maintained.").

18

control physical aspects of buildings in established use districts. Once a use classification is established, subsequent site or development regulations will necessarily refer back to a use classification to ensure that prescribed densities, lot sizes, and the like are appropriate for the permitted types of use. *E.g.*, *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 925–26 (Tex. 1998) (discussing density requirements for residential uses); *cf.* Salsich, *supra*, at 1.

Instead of restricting the purposes for which land can be used, the Ordinance focuses on protecting and preserving the exterior architectural characteristics of buildings based on historical significance, distinctiveness, and connection to a neighborhood. The Ordinance restricts: 1) the alteration, rehabilitation, restoration, and construction of exterior features of buildings in historic districts; 2) the relocation of buildings within or into historic districts; and 3) property owners' right to allow their buildings to fall into a serious state of disrepair affecting exterior architectural features. HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-236. These are not land-use regulations. And unlike most site regulations, they do not refer back to existing use classifications.

In addition, like the locational restrictions in *Johnny Frank's* and *Northwest Enterprises* and the use restrictions in *Comeau*, the Ordinance is so targeted that it lacks the geographic comprehensiveness associated with zoning regulations. The record shows that the Ordinance applies to less than one percent of the total lots in the City. And the Ordinance is not even geographically comprehensive in the sense that it creates districts for every area of historical significance in Houston. Rather, it provides a uniform procedure for area residents to follow if they wish to create their own districts. *Id.* § 33-222.1(f) (requiring support from owners of 67 percent of all tracts in proposed district).

Turning to site regulations of the height, bulk, and placement of buildings, traditional zoning regulations standardize these parameters across the district. The Ordinance also affects height, bulk, and placement, so it reaches one of the common subjects of zoning. But unlike traditional zoning, the Ordinance's impact on height, bulk, and placement is not standardized; rather, it is a by-product of its focus on preserving the exterior features of individual structures.

Zoning ordinances typically limit the bulk and size of buildings through minimum setback requirements and maximum height restrictions. RATHKOPF'S, *supra*, § 54:2. Their general purpose is to "prevent the overcrowding of land and avoid undue concentration of population." AM. LAW OF ZONING, *supra*, § 9:56. Height regulations usually "state maximum heights either in terms of feet or number of stories or both" and define how height must be measured. LAND USE PLANNING AND DEVELOPMENT REGULATION LAW, § 4:12 (3d ed.) (updated Jan. 2021). Other site restrictions establish minimum lot size, minimum frontage lots, and limits on the ratio between floor cover and area of a lot. *Id.* § 4:13.

The Ordinance does not establish fixed height, size, or location requirements for the district as a whole and does not seek to prevent overcrowding. Instead, the Ordinance impacts the site by requiring alterations and additions to a building to remain compatible with the building's own existing height, size, and location, and with that of the rest of the district. HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-241. For new construction in historic districts, site characteristics must be compatible with the same features of surrounding buildings that contribute to the historical significance of the area. *Id.* § 33-242(a). These site regulations function as criteria for the issuance of a certificate of appropriateness, so their only effect is to limit the alteration, rehabilitation, restoration, or construction of an exterior feature of a building. *Id.* § 33-236. They

20

therefore serve to preserve the exterior architectural characteristics of the buildings in a historic district.[13]

As to uniformity, the Ordinance applies to all structures within a historic district. *Id.* §§ 33-222.1(b)(3), -236(b). But it does not meet the traditional uniformity requirement that "property located within the same zoning district must be subject to uniform regulations." AM. LAW OF ZONING, *supra*, § 9:23.10. As discussed above, each property in a historic district is required to maintain its unique exterior features in a manner that preserves their historical significance, or to construct new exterior features in a manner that matches the features of historically significant buildings in the area. Because each building is regulated according to its own features or the features of nearby buildings, there is no uniform standardization of height, bulk, and placement across the district as in traditional zoning laws. There are also different restrictions and procedures that apply to different classes of structures depending on whether each structure contributes to the historical significance of the area. HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, §§ 33-241, -241.1.[14] And each historic district's design guidelines can be unique given that each district has its own architectural characteristics and features. *Id*. § 33-267(b)(3).

---

[13] It is also notable that none of the definitions or discussions of zoning we have surveyed contemplate the enactment of site regulations without use regulations. To decide this case, however, we need not determine whether an ordinance must have all of the common features we identify—or to what degree each feature must be present—for the ordinance to qualify as zoning. Thus, we do not hold—as our concurring colleagues maintain—that an ordinance must expressly regulate an activity other than property development to qualify as zoning. *See post* at __.

[14] Though the traditional uniformity requirement might disfavor this variety across a city or within districts, zoning-enabling statutes sometimes allow regulations to vary among districts or classes and kinds of buildings. *E.g.*, TEX. LOC. GOV'T CODE § 211.005(b). As we discuss below, legislatures are free to adopt their own definitions of "zoning" without deferring to the common, ordinary meaning of the term.

Finally, the enforcement and penalties provisions of the Ordinance show that it is distinct from zoning regulation. The Local Government Code provides different remedies to municipalities for violations of zoning ordinances and for damage to designated historic structures. Municipalities generally may impose fines up to $500 for violating an ordinance, but that amount increases to $2,000 for violating zoning ordinances. *See* TEX. LOC. GOV'T CODE § 54.001(b)(1). For harm to historic structures—which include historic structures designated by ordinance in the City of Houston, *see* TEX. GOV'T CODE § 442.001—the City is entitled to damages equal to the cost of restoration or construction of a reasonable facsimile of the historic structure. TEX. LOC. GOV'T CODE § 315.006(c).

The Ordinance incorporates Government Code section 315.006 by reference and emphasizes the City's right to enjoin and abate violations. HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-203(a). Though the Ordinance does allow for fines, they are capped at $500— far less than the $2,000 allowed in the Local Government Code for violations of a zoning ordinance. *Id.* § 33-203(c). By claiming the remedies available for damage to historical structures under Government Code section 315.006 and effectively disclaiming the remedies available for zoning ordinance violations, the City crafted an ordinance to preserve historic buildings that is unlike traditional zoning ordinances.

In sum, the Ordinance does not regulate the purposes for which land can be used, lacks geographic comprehensiveness, impacts each site differently in order to preserve and ensure the historic character of building exteriors, and does not adopt the enforcement and penalty provisions characteristic of a zoning ordinance. For these reasons, the Ordinance is not zoning as that concept

22

is ordinarily understood.  We therefore hold that the Ordinance was not enacted in violation of the City Charter.

**C.        The Homeowners' proposed definition of zoning sweeps too broadly.**

The Homeowners would have us define zoning as the legal regulation of land by geographic district and conclude that, in creating a historic district in Heights East, the City has necessarily engaged in zoning.  But the Ordinance is not a zoning regulation merely because it creates districts with geographic boundaries.  By that logic, the City could not regulate floodplain zones or create Tax Increment Reinvestment Zones and utility districts.  It seems implausible that the City, in passing its 1994 Charter amendment repealing any existing zoning ordinance and limiting future zoning, intended to repeal all of Houston's district-based regulation of land.  *See N.W. Enters.*, 27 F. Supp. 2d at 797.  Yet that is the result that would follow from the Homeowners' position.

For example, the City has adopted standards for new construction and substantial improvements to structures that apply only in special flood hazard areas.  HOUSTON, TEX., CODE OF ORDINANCES, ch. 19, art. III, § 19-32(a).  These areas include all land subject to a certain chance of flooding each year, and this land is subdivided into zones—A Zones, AE Zones, and V Zones to name a few—that are defined geographically.[15]  These construction and improvement standards are regulations of land by geographic district and would be voided by the Charter under the Homeowners' definition of "zoning."

---

[15] *Id.* § 19-2 (defining "Special flood hazard area"); *see also* Harris County Flood Control District, *Harris County Flood Education Mapping Tool*, https://www.harriscountyfemt.org/ (last accessed May 28, 2021).

We also note that state law not only authorizes but mandates that the City participate in the National Flood Insurance Program, which it has done since 1973. TEX. WATER CODE § 16.3145; City of Houston, FLOODPLAIN MANAGEMENT PLAN 3 (2016). To participate, the City must adopt land-use and control measures for flood-prone areas that are adequate under federal guidelines. 42 U.S.C. §§ 4022, 4102. If the City cannot single out and regulate these flood-prone geographic areas, it cannot comply with state law.

The Homeowners' definition would also invalidate the City's rules regarding subdivision plat requirements in section 42 of the Code of Ordinances, which are authorized by Chapter 212 of the Local Government Code. *See* TEX. LOC. GOV'T CODE § 212.002 ("[T]he governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality . . . .").[16] There are three different classes of subdivision plats and different standards for approval of a platting application for each one. HOUSTON, TEX., CODE OF ORDINANCES, ch. 42, art. II, §§ 42-20(b), -41 to -43. As with flood zones, these plat requirements impose regulations based on geographic districting and would be subject to the Charter's zoning limitations under the Homeowners' definition.

Even the Homeowners' narrowest statement of their definition—the "regulation of size, area, density, and aesthetics, as well as use . . . based on geographic districting"—would condemn other district-based regulations. Applying this definition to specific provisions in the Code of

---

[16] Given our disposition, we need not consider whether Chapters 212 or 213 authorize the Ordinance at issue here.

Ordinances of the City of Houston, many of the City's land-development tools would constitute impermissible zoning.

For example, the City prohibits certain uses of land in airport land-use tiers. *Id.* § 9-360. It also regulates use through minimum-distance buffers by prohibiting, for example, the operation of an automobile storage lot or metal recycler within 300 feet of a church, school, or residence. *Id.* § 28-34. Through these distance buffers, any contiguous group of residences—or of any other protected-use buildings—becomes a small geographic district within which certain uses are prohibited.

There are aesthetic requirements for structures directly abutting or within 30 feet of property used for single-family residences: these structures must maintain a solid masonry wall or wooden fence, vegetation or non-vegetative permeable cover, at least one tree for every 20 feet of the property line, and be free from mechanical equipment. *Id.* §§ 42-1, -272(a)(2). As with use restrictions based on minimum-distance buffers, these aesthetic regulations fall within the Homeowners' definition because they draw a line around areas with single-family residences and regulate what can happen on either side of that line.

There are also special minimum-lot-size restrictions applying to areas of land in which 80 percent of the lots are developed for single-family residences. *Id.* § 42-197(c). These areas are like the districts the Homeowners reside in, with specific regulations applying only within those districts.

Taking these examples of district-based regulation together, the Homeowners' definition of zoning would apply to many aspects of the City's Code of Ordinances and jeopardize some of

the City's most basic and long-standing tools for planning and development. We see no indication that the voters meant for the Charter's restrictions on zoning to have that effect.

\* \* \*

Because the Ordinance does not fall within the ordinary meaning of "zoning," the Homeowners failed to carry their burden of showing that the City clearly abused its discretion in enacting the Ordinance, which regulates historic preservation and does not zone under the Charter. The trial court therefore correctly rejected the Homeowners' requested declaration that the Ordinance is void because it violates the Charter's limits on zoning.

## II.     Chapter 211 applies to the Ordinance, but the Homeowners have not shown that the City failed to comply with certain of its requirements.

The City Charter is not the only basis for the Homeowners' challenge to the Ordinance: they also allege that it violates Chapter 211 of the Local Government Code. Chapter 211 imposes certain procedural and substantive requirements that traditional city zoning regulations must meet. The Legislature has also chosen to apply these requirements to regulations that would not traditionally be considered zoning, such as regulation of structures in historically significant areas and certain pumping and use of groundwater. In particular, section 211.003—entitled "Zoning Regulations Generally"—lists several different subjects that "the governing body of a municipality may regulate," including "the construction, reconstruction, alteration, or razing of buildings and other structures" in "designated places and areas of historical, cultural, or architectural importance and significance." TEX. LOC. GOV'T CODE § 211.003(b). This legislative choice to group together various types of city regulations and subject them to the same statutory requirements does not alter the traditional meaning of zoning for purposes of the City Charter, but it does frame the parties' dispute about whether Chapter 211's requirements apply to the Ordinance.

26

The City argues that Chapter 211 is only one avenue for cities to regulate historic buildings and districts: they may also do so under their home-rule police powers. The City emphasizes Chapter 211's permissive language and reasons that even if a city "may regulate" historical buildings and structures under section 211.003(b), it is not required to do so. Because Houston is a home-rule city, it has the full power of local self-government, and no grant of power in the Local Government Code can prevent it from exercising the authority incident to self-government. *Id.* § 51.072. According to the City, it was authorized to enact the Ordinance under its home-rule powers.

The Homeowners agree that the police powers of home-rule cities include regulation of land for the purpose of historic preservation, but they argue that the home-rule amendment makes these powers subject to the general laws of the state. *See* TEX. CONST. art. XI, § 5. In their view, even if the home-rule amendment and Zoning Enabling Act each confer the power to enact historic-preservation ordinances, the procedural and substantive limitations in the Zoning Enabling Act apply to home-rule powers as well.

We agree with the Homeowners that Chapter 211 applies to the Ordinance, given the language of section 211.003(b) and the principle that home-rule powers are subject to the general laws of the State. But because the Homeowners have not shown that the City failed to comply with the substantive and procedural requirements of Chapter 211 at issue here, the trial court correctly rejected their requested declaration that the Ordinance violates that chapter.

A. **Chapter 211's requirements for zoning regulation extend to regulation of structures in historical areas.**

Like the City Charter, Chapter 211 does not contain a definition of "zoning." Instead, subsection 211.003(a) lists several forms of regulation—including size, density, location, and

27

use—that fall within the ordinary meaning of zoning discussed above, and the remainder of the chapter imposes certain substantive and procedural requirements on cities that adopt such "zoning regulations."

The Legislature also decided to treat regulation of buildings in historical areas as a form of "zoning regulation" under section 211.003(b) that is subject to the same procedural and substantive requirements. Though this choice is not consistent with the ordinary meaning of zoning, we have long recognized that the Legislature can define statutory terms however it wishes. *E.g.*, *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 134 (Tex. 2019).

In *Creative Oil*, a ranch sued by its oil-and-gas lessee for falsely telling purchasers of production that the lease had expired sought dismissal under the Texas Citizens Participation Act, arguing that its statements were related to the exercise of free speech as "matters of public concern," which by definition included issues related to "a good, product, or service in the marketplace." *Id.* at 130–31 (citing TEX. CIV. PRAC. & REM. CODE § 27.001). We ultimately concluded that the oil-and-gas lease was not a matter of public concern as defined in the statute, but we observed that a different result could follow had the Legislature enacted a different definition: "The legislature is of course free to define 'matter of public concern' to include matters of purely private concern. For that matter, the legislature could declare that its use of 'dogs' includes cats." *Id.* at 134.

By including historic-preservation regulations as a type of "zoning regulation," the Legislature has shown that it considers ordinances like the City's to fall within Chapter 211. The City may be correct in responding that its home-rule power provides an independent source of authority for the Ordinance, but that power is likewise constrained by Chapter 211's requirements.

28

Though home-rule municipalities have the full power of self-government, *see* TEX. LOC. GOV'T CODE § 51.072(a), the power granted by the home-rule amendment may be limited by other state laws: "The adoption or amendment of charters is subject to such limitations as may be prescribed by the Legislature, and no charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State." TEX. CONST. art. XI, § 5. However broad their power, home-rule municipalities cannot exercise it inconsistently with the laws of the State.

The Legislature did not surrender its own power to regulate in certain areas when it enacted the home-rule amendment: it may still regulate subjects usually within the powers of a home-rule municipality. *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 491 (Tex. 1993). Sometimes when the Legislature does so, it expressly preempts local regulation. *City of Laredo*, 550 S.W.3d at 593.[17]

In *City of Laredo*, the Solid Waste Disposal Act barred local governments from adopting ordinances to "prohibit or restrict, for solid waste management purposes, the sale or use of a container or package in a manner not authorized by state law." *Id*. at 589 (quoting TEX. HEALTH & SAFETY CODE § 361.0961(a)(1)). The City of Laredo enacted an ordinance preventing businesses from providing one-time-use plastic bags, and a group of businesses argued that the Act preempted the ordinance. *Id*. at 590–91. Though the City of Laredo had the full power of self-government under the home-rule amendment, we held the ordinance was preempted by the express prohibition in section 361.0961(a)(1), which restricted the scope of home-rule cities'

---

[17] The Legislature may also expressly recognize the right of a municipality to regulate the same subject. *E.g.*, *City of Richardson v. Oncor Elec. Delivery Co. LLC*, 539 S.W.3d 252, 262 (Tex. 2018) (citing TEX. TRANSP. CODE § 311.071).

powers of self-governance. *Id*. at 598. Similarly, we held in *Dallas Merchant's* that a city could not prohibit the sale of alcohol within 300 feet of a residential area when the Alcoholic Beverage Code specified that it "shall exclusively govern the regulation of alcoholic beverages in this state" unless otherwise provided. 852 S.W.2d at 491–92.

In other situations, the Legislature imposes substantive limits or procedural requirements on a city's exercise of regulatory power. The Zoning Enabling Act—now part of Chapter 211— is such a law. *See Bolton v. Sparks*, 362 S.W.2d 946, 949–50 (Tex. 1962). When the City of Dallas enacted an ordinance amending the existing zoning classification for railroad rights-of-way, it did not follow the mandatory procedures in the Zoning Enabling Act. *Id*. at 949. This Court struck down the ordinance, noting that those procedural safeguards were "essential to the exercise of jurisdiction of the City Council" and that municipal ordinances can be enforced only if they conform to limitations imposed by superior statutes. *Id.* at 949–50.

We recently followed *Bolton*'s logic in *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634 (Tex. 2013). That case turned on Local Government Code section 212.135, which required a city seeking to impose a development moratorium to provide a summary of evidence that the moratorium is "reasonably limited to . . . property that has not been approved for development." *Id.* at 641. A city could not adopt a moratorium without these specific findings. *Id.* (citing TEX. LOC. GOV'T CODE § 212.133). This meant that a city could not enact a moratorium affecting approved developments: it would be impossible for the city to find that a moratorium affected only property *not* approved for development in such a case. *Id.* The required showing that a moratorium be "reasonably limited to . . . property that has not been approved for development" therefore limited the authority of municipalities to enact moratoriums.

30

Applying the same reasoning to Chapter 211 and the Ordinance, we conclude that the City's authority to engage in historic preservation under its home-rule police powers is constrained by the requirements that Chapter imposes for historic preservation. This result is intuitive: if the Legislature expressly permits a city to regulate in an area and requires that it follow certain procedures when doing so, those procedures apply even if the city already possessed home-rule authority to regulate in that area.

**B.      The stipulated facts do not show that the City failed to comply with the provisions of Chapter 211 at issue.**

Having concluded that Chapter 211 applies to the Ordinance, we next consider whether the City complied with its requirements. The Homeowners have a heavy burden in challenging the Ordinance and must show conclusively that the City acted without authority in adopting it. *Tippit*, 616 S.W.2d at 176; *Thompson v. City of Palestine*, 510 S.W.2d 579, 581 (Tex. 1974). At the bench trial, which was conducted on stipulated facts, the Homeowners focused their challenges to the City's compliance with Chapter 211 on two sections: 211.004 and 211.007.

Section 211.004(a) provides that "zoning ordinances"—which, for Chapter 211 purposes, include historic-preservation regulations like these—must be adopted in accordance with a comprehensive plan. In arguing that Chapter 211 applies to the Ordinance, the Homeowners assert that "Houston actually does have the requisite planning to meet the legal requirements of [Chapter 211] and should be estopped from contravening its public proclamations." More specifically, the Homeowners contend that the "well-thought-out and extensive [Ordinance] . . . evidences a sufficient degree of planning to meet the statutory requirement." We agree.

Comprehensive zoning ordinances satisfy the "comprehensive plan" requirement of section 211.004. *Mayhew v. Town of Sunnyvale*, 774 S.W.2d 284, 294–95 (Tex. App.—Dallas

31

1989, writ denied); *see also City of University Park v. Benners*, 485 S.W.2d 773, *passim* (Tex. 1972). Here, the Ordinance is comprehensive with respect to the subject that the City has chosen to regulate under section 211.003(b): changes to structures in historical areas.

The Ordinance lays out in detail which changes are prohibited, which are allowed, and the procedures for carrying out allowed changes. Prohibited changes include those at issue here—the rehabilitation, alteration, restoration, or construction of exterior features of contributing structures in historic districts without a certificate of appropriateness—as well as similar changes to landmarks, excavation of archaeological sites, and the demolition and relocation of any of these places. HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-236. The Ordinance also requires that property owners not allow their landmarks and contributing structures to fall into a state of disrepair resulting in the deterioration of exterior features. *Id*. § 33-236(i). The exemptions are similarly thorough: certificates of appropriateness are not required for changes to fencing, gutters, downspouts, storm windows, window screens, screen doors, porch ceiling fans, HVAC units, and landscaping, to name a few. *Id*. § 33-237(a).

These prohibitions apply only to changes made without a certificate of appropriateness. The Ordinance also provides the form and procedure for submitting applications for certificates of appropriateness as well as the criteria for issuing them. *Id*. §§ 33-238 to -240. The Ordinance lays out the specific criteria applicable to each kind of change to historical buildings and sites, from new construction in historic districts to the demolition of landmarks. *Id*. §§ 33-242, -247.

The criteria for each are tailored and extensive. For new construction in historic districts, for example, the certificate will only issue upon findings related to the distance of the building from property lines, the compatibility of exterior features with those of contributing structures, and

32

the scale, proportions, and height of the new construction relevant to existing contributing structures. *Id*. § 33-242. For changes to exterior features of an existing structure in a historic district, eleven separate findings are required. *Id*. § 33-241. And if an application for a certificate of appropriateness is denied, there is an appeal process carried out before a board created for that purpose. *Id*. § 33-253.

Collectively, these examples show that the Ordinance is a comprehensive plan for the regulation of changes to buildings in historic districts. The Homeowners' own position that the Ordinance is a comprehensive plan under section 211.004 reinforces this conclusion.

The Ordinance does not fail the comprehensive-plan requirement simply because many parts of the City do not contain historic buildings or districts. Some of the property features a city may regulate under Chapter 211—like the height, size, location and use of buildings and population density—are common throughout an entire city. TEX. LOC. GOV'T CODE § 211.003. But the Legislature also contemplated regulations that will affect only certain areas. For example, groundwater pumps can be regulated under section 211.003(a)(6), but these pumps are only placed where groundwater collects. Similarly, historically significant buildings are not located everywhere throughout an entire city, so regulating these buildings will only impact certain areas. But the Ordinance can apply to any geographic area within the City if it meets the generally applicable criteria for designation as a historic district, has sufficient public support from affected landowners, and is approved by the Commission and City Council. HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, §§ 33-222.1, -224, -225. The districts themselves must be contiguous land masses without carve-outs, *id.* § 33-222.1(3), and once the designation is made, properties within historic districts cannot be singled out and exempted from historic-preservation

33

regulation. *Cf. id.* § 33-228. The prohibited activities within historic districts and the respective criteria for designation of historic districts and issuance of certificates of appropriateness apply to all designated historic districts, showing that the Ordinance's effects are not strictly localized but apply throughout the city. *See id.* §§ 33-224, -226, -240, -241.

The Ordinance is therefore a city-wide, comprehensive plan to regulate the alteration, construction, and razing of buildings in historic areas. *See* TEX. LOC. GOV'T CODE § 211.003(b).[18] Because the Legislature considers historic-preservation regulations to be zoning regulations under section 211.003(b) of the Local Government Code, we hold the Ordinance is a zoning regulation adopted in accordance with a comprehensive plan under section 211.004(a).[19]

The Homeowners also challenge the City's compliance with section 211.007(a). That provision requires a home-rule municipality to appoint a zoning commission to implement the regulations authorized by Chapter 211. Because the Legislature has classified historic preservation as a type of zoning regulation for purposes of Chapter 211, we conclude that the Houston Archaeological and Historical Commission serves as a zoning commission under section 211.007(a).

Appointed zoning commissions are required to recommend boundaries and regulations for zoning districts. *Id.* § 211.007(a). They must make a preliminary report, hold public hearings

---

[18] A contrary holding that regulation of historic areas wherever they appear in a city fails the comprehensive-plan requirement of section 211.004(a) would impermissibly nullify section 211.003(b), which expressly authorizes the regulation of changes to structures in areas of historical significance.

[19] We note that the City argues the Ordinance is not comprehensive in the sense that it does not encompass a wide range of land development within districts throughout the entire city. But that argument does not address comprehensiveness as to the specific subject being regulated here: changes to structures in historic areas.

before submitting recommendations to the governing body of the municipality, and notify owners of property in or near those zones of hearings beforehand. *Id*. § 211.007(b), (c).

Under the Ordinance, the Houston Archaeological and Historical Commission does each of these things. It makes recommendations to the City Council by identifying areas with the potential for historic-district designations and initiating the designation process. HOUSTON, TEX., CODE OF ORDINANCES, ch. 33, art. VII, § 33-214(3). The Commission also reviews applications submitted by others for designation of landmarks and historic districts and must make a recommendation on these applications before the Council decides whether to make the designation. *Id.* § 33-221(c). For each application, the Commission must hold a hearing and notify affected property owners beforehand. *Id*. §§ 33-225, -226.

In sum, the Commission does exactly what Chapter 211 requires a zoning commission to do. The Homeowners have therefore failed to show that the Ordinance violates section 211.007(a) on the ground that the City does not have a zoning commission.

We note that Chapter 211 includes other requirements for regulating structures in historically significant areas. We do not address those requirements, however, because the Homeowners have not sought declarations or supplied evidence regarding whether the City complied with them. Deciding only what is before us, we hold that the trial court correctly rejected the Homeowners' requested declaration that the Ordinance is void for failure to comply with Chapter 211.

### CONCLUSION

The Homeowners sought declarations that the Ordinance is void on two grounds, and we have concluded that both fail. The City Charter's limitations on the power to zone do not apply to

35

the Ordinance's historic-preservation regulations because they do not fall within the ordinary meaning of "zoning." Though the same regulations do fall within the scope of Chapter 211 as set by the Legislature, the Homeowners have not demonstrated that the City failed to comply with section 211.004 or 211.007. Because the Homeowners did not clearly demonstrate that the Ordinance is void under either the Charter or Chapter 211, we affirm the judgment of the court of appeals.

_____
J. Brett Busby
Justice

Opinion delivered: June 4, 2021